**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | |
|---|---|
| **BRIGGS ALEXANDER,** ) | Case No. |
| c/o Megan A. Bonanni, Esq. ) | |
| PITT, McGEHEE, PALMER, BONANNI & ) | **Judge:** |
| RIVERS P.C. ) | |
| 117 West Fourth Street, Suite 200 ) | **COMPLAINT FOR DAMAGES** |
| Royal Oak, Michigan 48067 ) | **AND JURY DEMAND** |
| ) | |
| **and** ) | |
| ) | |
| **JANE DOE,** ) | |
| c/o Megan A. Bonanni, Esq. ) | |
| PITT, McGEHEE, PALMER, ) | |
| BONANNI & RIVERS P.C. ) | |
| 117 West Fourth Street, Suite 200 ) | |
| Royal Oak, Michigan 48067 ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **THE UNIVERSITY OF KENTUCKY,** ) | |
| ) | |
| Serve: ) | |
| Office of General Counsel ) | |
| 301 Main Building ) | |
| University of Kentucky ) | |
| Lexington, Kentucky 40506-0032 ) | |
| ) | |
| **and** ) | |
| ) | |
| **LARS PALSBERG JORGENSEN,** ) | |
| 801 East Brannon Road, Unit 927 ) | |
| Nicholasville, Kentucky 40356 ) | |
| ) | |
| **and** ) | |

**MITCHELL S. BARNHART,**                    )
10 Legacy Lane                               )
Frankfort, Kentucky 40601-8315               )
                                             )
**and**                                      )
                                             )
                                             )
**GARY CONELLY,**                            )
843 Audubon Drive                            )
Bradenton, Florida 34209-7307                )
                                             )
**Defendants.**                              )

2

# <u>TABLE OF CONTENTS</u>

Introduction ................................................................................... 1

Parties, Jurisdiction, and Venue ........................................................... 4

FACTUAL ALLEGATIONS ............................................................... 6

I.   1980's to 2012: Lars Jorgensen Cultivates a Reputation as an Elite
     Swimmer, Olympic Qualifier, and Successful Coach, but is Marred by
     Allegations of Sexual Abuse. ................................................... 6

II.  June 20, 2012: The University of Kentucky Hired Jorgensen as the
     Associate Head Coach for the University's Swimming and Diving
     Program and Immediately Receives Notice of Jorgensen's Elicit
     Sexual Relationship with a Swimmer, While at the
     University of Toledo ............................................................. 7

     A.   June 20, 2012: Report Made to Head Coach Gary Conelly. ........... 7

     B.   June 20, 2012: Report Made to Athletics Director Mitch Barnhart. ..... 10

     C.   April 17, 2013: Report Made to Associate Head Coach
          Derek Perkins. ............................................................. 11

     D.   2012 – 2013: The University of Kentucky Athletics Department Failed
          to Respond to Credible Allegations that Jorgensen had an
          Inappropriate Sexual Relationship with a College Athlete. ............... 12

III. 2013 – 2023: The University of Kentucky Promoted Jorgensen to
     the position of Head Coach of the University's Swimming and
     Diving Program and Allowed Him to Sexually Harass, Abuse,
     and Rape Student-Athletes and Coaches. ................................... 14

     A. Lars Jorgensen Repeatedly and Violently Sexually Assaulted
        Assistant Coach Jane Doe II. ............................................. 17

     B. Lars Jorgensen Spent Years Grooming Briggs Alexander (formerly
        Bridgette Alexander), Creating a Sexually Hostile Environment,
        Sexually Assaulting and Violently Raping Him. ........................... 19

i

a.  2014 – 2017: University Employees Observe Jorgensen's Grooming and Exertion of Control over Alexander. .................20

    i.   Jorgensen Sought to Gain Alexander's Trust. ............20

    ii.  Jorgensen Asserted Control Over Alexander. ............21

        a.  Jorgensen Controlled Alexander's Food Intake, Body Perception, and Overall Health. ............21

        b.  Jorgensen Sought to Control Alexander's Personal Life, Subjecting Her to Constant Communication. ...............................................23

        c.  Jorgensen Sought to Control Alexander Through Emotional Abuse. .............................24

    iii. Jorgensen Sought to Control Alexander Through Isolation. ....................................................................24

    iv. Jorgensen Fostered a Sexualized Environment to Normalize Sexual Content and Behavior. .................25

b)  2017 – 2018: Jorgenson's Behavior Escalates. .....................26

c)  2018 – 2019: Jorgensen Repeatedly Sexually Assaulted Alexander. ..........................................................................28

d)  2019 – 2023: Jorgensen Escalates to Forcible Rape ............31

    i.    December of 2019: Jorgensen Forcibly Rapes Alexander. ........................................................................30

    ii.   March of 2020: Jorgensen Forcibly Rapes Alexander for a Second Time. ................................................................32

    iii.  Spring of 2020: Jorgensen Forcibly Rapes Alexander for a Third Time. ................................................................33

iv. May of 2020 – July of 2021: Alexander Leaves UK for the University of Buffalo and Jorgensen Continues to Sexually Harass Her..........................................................34

v. July of 2021: Alexander Returns to UK as an Assistant Coach, Where Jorgensen Resumes Sexually Harassing and Assaulting Her............................................34

vi. December of 2021: Jorgensen Forcibly Rapes Alexander for a Fourth Time...............................................36

vii. May 4, 2022: Alexander Resigns from Coaching as a Direct Result of Jorgensen's Sexual Harassment and Abuse.........................................................37

viii. April 13, 2023: Jorgensen Forces Alexander to Perform Oral Sex for the Second Time. ...........................38

C. Lars Jorgensen Spent Years Grooming Jane Doe, Creating a Sexually Hostile Environment, and Escalating His Behavior to Ultimately Sexually Assault Her. ..................................................39

a) 2017 – 2022: Jorgensen Groomed Jane Doe in View of University Employees. ...........................................39

i. Jorgensen Sought to Gain Jane Doe's Trust. .............40

ii. Jorgensen Asserted Control Over Jane Doe. ............40

a. Jorgensen Controlled Jane Doe's Food Intake, Body Perception, and Overall Health. ........41

b. Jorgensen Sought to Control Jane Doe's Personal Life, Subjecting Her to Constant Communication. ..........................................43

c. Jorgensen Sought to Control Jane Doe Through Emotional Abuse.........................................43

iii. Jorgensen Fostered a Sexualized Environment to Normalize Sexual Content and Behavior................44

b) 2022: Jorgensen's Behavior Escalates. ................................45

c) December 28, 2022: Jorgensen Assaulted Jane Doe. ..........46

d) 2022: Jane Doe Discloses Her Assault to Numerous UK Employees. ........................................................................48

i. May of 2023: Jane Doe Disclosed Sexual Assault to Associate Head Coach Michael Camper. ...........................49

ii. July 7, 2023: Jane Doe Disclosed Assistant Coach Jarrod Lieberman. ........................................................................49

D. Spring of 2023: Briggs and Jane Doe Report Jorgensen's Sex Harassment and Abuse to the University's Title IX Office...........................................50

a) University of Kentucky Discourages Alexander from Reporting..............................................................................51

b) University of Kentucky Discourages Jane Doe from Reporting..............................................................................53

IV.    June 28, 2023: Jorgensen Resigns from His Position at the University of Kentucky and is Paid a $75,000 Settlement.........................................57

V.    The University of Kentucky Concealed Their Role in Creating a Pervasive Culture of Harassment/Assault in the University's Swimming and Diving Program...........................................................................................59

VI.    November 14, 2023: SafeSport Adds Jorgensen to its Disciplinary Database for Allegations of Misconduct. ...................................60

COUNT I – SEX HARASSMENT IN VIOLATION OF TITLE IX .................61

COUNT II – SEX DISCRIMINATION IN VIOLATION OF THE KENTUCKY CIVIL RIGHTS ACT.............................................................................66

COUNT III – VIOLATION OF BODILY INTEGRITY ...................................70

COUNT IV – FAILURE TO TRAIN AND SUPERVISE ................................. 75

COUNT V – NEGLIGENCE .............................................................. 77

COUNT VI – VICARIOUS LIABILITY FOR BATTERY PURSUANT TO
SECTIONS 219 OF THE RESTATEMENT (2ND) OF AGENCY .................. 79

COUNT VII – VICARIOUS LIABILITY FOR BATTERY PURSUANT TO
SECTION 317 OF THE RESTATEMENT (SECOND) OF TORTS ................ 81

COUNT VIII – BATTERY ................................................................ 82

COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL
DISTRESS .................................................................................. 83

## **INTRODUCTION**

For ten years, the University of Kentucky ("University") empowered Lars Jorgensen ("Jorgensen"), Head Coach of the University's Swimming and Diving Program, to foster a toxic, sexually hostile environment within the swim program and to prey on, sexually harass, and commit horrific sexual assaults and violent rapes against young female coaches and collegiate athletes who were reliant on him. The University was aware of and constructively approved of its toxic swim program culture under the leadership of Coach Jorgensen, purposefully disregarding multiple credible reports of inappropriate sexual relationships and sexual assaults, which provided the University with actual notice of his assaults, and aggressively discouraging students and employees from filing reports with the Title IX Office because it "would be pointless."

As a result of the University of Kentucky's decisions, the University enjoyed ten years of success under the leadership of Coach Jorgensen, a man who transformed the University's Swim Program from one of the worst in the country to one of the best. But the price of success required athletes and employees to submit to Coach Jorgensen's toxic and hostile environment, where female athletes were openly objectified, humiliated and taunted. Conducting himself like a demigod, Jorgensen exerted absolute control over every aspect of the lives of his female swimmers and staff, openly commenting on swimmer's bodies, the size of their

chests and how appealing they looked in their bathing suits. He fetishized their bodies, monitoring every calorie they consumed, and publicly shaming them if they gained a pound. A condition of membership on the team mandated swimmers maintain dangerously low body fat percentages, often resulting in the cessation of their menstrual cycles. He was mercurial; at one moment lavishing praise on a swimmer in order to gain their trust, only to violently gaslight and debase them when he sought to exert control. Coach Jorgensen groomed his future victims, using a calculated plan to ensure compliance when he escalated to sexual assault.

Plaintiffs Briggs Alexander and Jane Doe are two former collegiate swimmers and employees of the University of Kentucky, where they were subjected to a sexually hostile environment, groomed, and sexually assaulted by Coach Jorgensen.

Yet, without the complicity and deliberate indifference of the University of Kentucky, Coach Jorgensen would not have been in a position to prey on the plaintiffs, and others. The University was aware of Coach Jorgensen's predisposition to harass young women.  Even before he was officially installed in his role as Head Coach at the University, Athletics Department leadership received credible reports from a University of Toledo Coach that then-Associate Head Coach Jorgensen was a sexual predator and could not be trusted around young women. While at the University of Toledo, Jorgensen engaged in an inappropriate sexual relationship with a young female athlete, purposefully capturing a sexual encounter with the

athlete – in which the athlete appeared incapacitated – on university equipment. Instead of investigating, the University of Kentucky's Athletics Department made a conscious decision to conceal the allegations and any suspicion that they were employing an individual with credible allegations of inappropriate sexual behavior. When similar allegations resurfaced soon after Coach Jorgensen was promoted to Head Coach, the University once again affirmatively chose to conceal their knowledge of Coach Jorgensen's previous abuse of young women and refused to investigate these credible allegations.

Over the ten years that Coach Jorgensen was at the University of Kentucky, the University received numerous allegations of inappropriate sexual behavior against Coach Jorgensen from a variety of sources, including a former assistant coach who reported to Coach Jorgensen at another university, a lawsuit filed by a coach at another University, current and former employees who reported to Coach Jorgensen at the University, and another university's Title IX Office. Incredibly, the Kentucky University failed to document allegations or pursue any investigative efforts; instead, opting to purposefully conceal these allegations, discourage reporting, and mislead survivors into believing that their assaults were isolated incidences instead of acts perpetrated by this repeat offender, regardless the threat posed to the University's female coaches and swimmers. The University placed

3

student-athletes and coaches directly in harm's way, enabling Coach Jorgensen to cause Plaintiffs, and untold others, lifelong trauma.

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Briggs Alexander ("Alexander"), formerly Bridgette Alexander, is a former female collegiate swimmer and assistant coach at the University of Kentucky and current resident of Fayette County, Kentucky.

2.     Plaintiff Jane Doe ("Jane Doe")[1] is a former female collegiate swimmer and assistant coach at the University of Kentucky and current resident of Allegheny County, Pennsylvania.

3.     Defendant University of Kentucky ("UK" or "University") is a public university that receives state funding, as well as federal funding and financial assistance within the meaning of 20 U.S.C. §1681(a) and is otherwise subject to Title IX, is organized under the laws of Kentucky, and located in Fayette County, Kentucky.

4.     Defendant Lars Jorgensen ("Jorgensen") was the Head Coach of the University of Kentucky's Swimming and Diving Program from 2013 to 2023 and is

---

[1]     Plaintiff seeks to proceed under pseudonym consistent with other Federal Courts' treatment of party names in highly sensitive sexual assault cases that arise under Title IX of the Education Amendments, *see e.g. Doe v. Erskine College*, Case No. 8:04-23001, 2006 WL 1473853 (D.S.C. May 25, 2006).  As required, Plaintiff will seek appropriate relief from the Court to continue to proceed in this fashion and to otherwise protect Jane Doe's anonymity.

a current resident of Jessamine County, Kentucky. Defendant Jorgensen is being sued in his individual capacity.

5.     Defendant Mitch Barnhart ("Barnhart") is the current Athletics Director at the University of Kentucky, a role he has held continuously since 2002, and is a current resident of Franklin County, Kentucky. Defendant Barnhart is being sued in his individual capacity.

6.     Defendant Gary Conelly ("Conelly") was the Head Coach of the University of Kentucky's Swimming and Diving Program from 1991 to 2013, and is a current resident of Manatee County, Florida. Defendant Conelly is being sued in his individual capacity.

7.     This Court has personal jurisdiction over the parties to this Complaint.

8.     Pursuant to 28 U.S.C. §1331, this Court has subject matter jurisdiction over this matter because Plaintiffs' claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq*. arise under federal law.

9.     This Court also has subject matter jurisdiction over the matters alleged based on the diversity of the parties under 28 U.S.C. §1332(a).

10.     Pursuant to 28 U.S.C. §1367, this Court should exercise supplemental jurisdiction over Plaintiffs' state law claims because those claims arise out of the same set of operative facts as Plaintiffs' federal claims, such that all claims form part of the same case and controversy.

11.     Pursuant to 28 U.S.C. § 1391, venue is established in this District Court because the events giving rise to the lawsuit primarily occurred in the Eastern District of Kentucky

## **FACTUAL ALLEGATIONS**

I.     **1980's to 2012: Lars Jorgensen Cultivates a Reputation as an Elite Swimmer, Olympic Qualifier, and Successful Coach, but is Marred by Allegations of Sexual Abuse.**

12.     Jorgensen, now age 53, had a successful career as a student-athlete at the University of Tennessee and subsequently as a coach for twenty years.

13.     As a student-athlete, Jorgensen broke several program records, won six National Championships, and represented the United States at the 1988 Seoul Olympics.

14.     After ending his swim career, Jorgensen went on to coach, holding the following positions:

a)  Graduate Assistant Coach at the University of Tennessee, 1994 to 1995;

b)  Assistant Coach at Louisiana State University, 1999 to 2004;

c)  Head Coach at the University of Toledo, 2004 to 2010;

d)  Assistant Coach at the University of Tennessee, 2010 to 2011;

e)  Interim Head Coach at the University of Tennessee, 2011 to 2012.

15.     Jorgensen's tenure with each collegiate program was marked by success, with Jorgensen improving the metrics of each program and competing at a national level.

16.     However, Jorgensen's career was also marred by scandal and allegations of sexual abuse.

17.     By way of example, during Jorgensen's tenure at the University of Toledo, credible reports were made that Jorgensen sexually assaulted one of the female collegiate swimmers.

18.     Mark Howard ("Howard"), an Assistant Swimming Coach at the University of Toledo, learned of Jorgensen's misconduct when he discovered a video, filmed on a university camera, in which Jorgensen was having sexual intercourse with the swimmer, who appeared to be incapacitated.

19.     Based on Coach Howard's viewing of the video, he believed Jorgensen was sexually assaulting the swimmer and filming it using University equipment.

20.     Coach Howard subsequently reported what he had seen in the video to individuals within the Athletics Department at the University of Toledo.

**II.     June 20, 2012: The University of Kentucky Hired Jorgensen as the Associate Head Coach for the University's Swimming and Diving Program and Immediately Received Notice of Jorgensen's Elicit Sexual Relationship with a Swimmer, While at the University of Toledo.**

21.     In June of 2012, the University of Kentucky hired Jorgensen as the Associate Head Coach for the University's Swimming and Diving Program.

**A. June 20, 2012: Report Made to Head Coach Gary Conelly.**

22.     The news of Jorgensen's hire at UK broke on June 20, 2012.[2]

23.     That same day, June 20, 2012, Coach Howard, learning the news of Jorgensen's hiring, reported Jorgensen's prior inappropriate sexual conduct to Gary Conelly ("Conelly"), the Head Coach of the University's Swimming and Diving Program, stating via e-mail:

> "I coached at Toledo for a year then had to run away as fast as I could. While there a former Toledo swimmer made it known to me about a sexual relationship she had with Lars begore she had graduated. I confronted Lars about it, and made it very clear that he stay away from any Toledo swimmers for as long as he was alive. Had I known he was interviewing with Kentucky I certainly would have called.
>
> I wish you the best and hope he does not bring down your University. This is no joke at all and I cannot stomach the fact that he will be coaching women again."

24.     On June 21, 2012, Conelly responded to Coach Howard, confirming receipt of Coach Howard's e-mailed report, stating:

> "This is a disturbing allegation[.] I appreciate you bring[ing] it to my attention. We are starting to look into this and I'm hoping you can give me a little more information."

---

[2]     Braden Keith, *Lars Jorgensen Hired at Kentucky*, SwimSwam (June 20, 2012), https://swimswam.com/lars-jorgensen-hired-at-kentucky/; *Jorgensen Appointed Associate Head Coach*, UKNow University of Kentucky News (June 20, 2012), https://uknow.uky.edu/uk-athletics/men/jorgensen-appointed-associate-head-coach.

25.    Within two hours, Coach Howard responded to Conelly's e-mail agreeing to talk further, providing his phone number, and asking to schedule a time the following day.

26.    Conelly never responded to Coach Howard's e-mail of June 21, 2012, or called him at the phone number Coach Howard provided.

27.    Circumventing University policy related to reporting complaints of sexual harassment/assault,[3] in response to Coach Howard's allegations, Conelly obtained the name and contact information from the young woman (ostensibly from Jorgensen) and unilaterally contacted her to confirm whether the sexual relationship was allegedly consensual.

28.    Upon information and belief, Conelly kept what he had learned regarding Jorgensen within the confines of the highest levels of the University's Athletics Department.

29.    According to Conelly, sexual relationships between male coaches and female athletes are of no consequence and not overtly problematic for Jorgensen's employment with the University.

---

[3]      UK Sex Harassment Policy and Ethical Principles and Code of Conduct
https://regs.uky.edu/sites/default/files/2022-03/ar_6-1_final_2016-07-01_update.pdf
https://universitysenate.uky.edu/sites/default/files/University%20of%20Kentucky%20Ethical%20Principles%20and%20Code%20of%20Conduct.pdf

30.    Conelly contained these credible allegations of Jorgensen's sexual abuse within the athletic department, and failed to take any appropriate actions to investigate, including but not limited to, failing to:

      **a)** personally investigate the allegations further;

      **b)** escalate the allegations to UK's Title IX Office, the Office of Institutional Equity and Equal Opportunity or Administration; and

      **c)** take other measures to protect members of the swim team and staff.

31.    Conelly intentionally concealed the allegations, ushering Jorgensen into the program as his Associate Head Coach and priming him to fill his position as Head Coach upon his planned retirement.

**B. June 20, 2012: Report Made to Athletics Director Mitch Barnhart.**

32.    A little over an hour later, on June 20, 2012, Coach Howard forwarded the e-mail containing allegations against Jorgensen to Mitch Barnhart ("Barnhart"), the Athletics Director at the University of Kentucky, telling him, "if I sit idly by with 1st hand knowledge then I am a man of no character. I just wanted you to know who would be at the healm [sic] of your Swimming and Diving Program."

33.    Barnhart chose not to respond to Howard's e-mail of June 20, 2012.

34.    Instead, Barnhart ignored these credible allegations of Jorgensen's sexual abuse, and failed to take any appropriate actions to investigate, including but not limited to, failing to:

**a)** personally investigate Coach Howard's allegations;

**b)** escalate Coach Howard's allegations for follow up or investigation;

**c)** escalate the allegations to UK's Title IX Office, the Office of Institutional Equity and Equal Opportunity or Administration; and

**d)** take other measures to protect members of the swim team and staff.

35.    Instead, Barnhart intentionally concealed the allegations, ushering Jorgensen into the program as Associate Head Coach and priming him to fill Conelly's position as Head Coach upon his retirement.

**C. April 17, 2013: Report Made to Associate Head Coach Derek Perkins.**

36.    In April of 2013, Coach Howard, again, reported Jorgensen's inappropriate sexual conduct from his time at the University of Toledo, writing to Derek Perkins ("Perkins"), Associate Head Coach of the University's Swimming and Diving Program, and telling him: "I warned Gary [Conelly] that Lars had issues keeping his hands off girls . . . Keep your eyes open man."

37.    Perkins never responded to Coach Howard's e-mail of April 17, 2013.

38.    Perkins did not undertake any follow up measures in response to Coach Howard's allegations, failing to:

**a)** personally investigate Coach Howard's allegations;

**b)** escalate Coach Howard's allegations for follow up or investigation;

**c)** escalate the allegations to UK's Title IX Office, the Office of Institutional Equity and Equal Opportunity or Administration; and take measures to protect members of the swim team and staff.

39. Instead, Perkins elected to stay silent, assuring that Jorgensen maintained his position as the program's Associate Head Coach and was primed to fill Conelly's position as Head Coach upon his retirement.

### D. 2012 – 2013: The University of Kentucky Athletics Department Failed to Respond to Credible Allegations that Jorgensen had an Inappropriate Sexual Relationship with a College Athlete.

40. Despite receipt of these communications, no one from the University of Kentucky followed up with Coach Howard or the University of Toledo about the alleged misconduct.

41. In light of Coach Howard's communications, UK's Athletics Department was aware, at a bare minimum, that there were credible allegations of an inappropriate sexual relationship between Jorgensen and a young student swimmer.

42. Even a purported *consensual* sexual relationship between a coach and student-athlete was cause for investigation.

43. By 2012, educational institutions throughout the country formally prohibited sexual relationships between students and coaches.

44.     By way of example, the University of Toledo adopted a formal prohibition against sexual relationships between students and coaches during Jorgensen's tenure there.[4]

45.     Likewise, the National Collegiate Athletic Association ("NCAA") has long-urged for formalized policies intended to prevent sexual relationships between student-athletes and coaches, stating: "NCAA member institutions must unambiguously and effectively prohibit such relationships to ensure that sport programs offer a safe and empowering experience for all student-athletes."[5]

46.     Sexual relationships between coaches and athletes are likely to compromise the professional integrity of the coach and educational mission of athletics. "Sexual relationships between coaches and athletes are wrong when the coach has professional responsibility for the athlete. Such situations greatly increase the opportunities for a coach to abuse his or her power and/or sexually exploit the athlete. Voluntary consent by the athlete in such a relationship is also suspect, given the fundamentally unequal nature of the relationship."[6]

---

[4]      *Consensual Romantic and/or Sexual Relationships,* University of Toledo (Dec. 1, 2007), https://www.utoledo.edu/policies/administration/humanresources/pdfs/3364-25-65.pdf.

[5]      Deborah L. Brake & Mariah Burton Nelson, *Staying in Bounds: An NCAA Model Policy to Prevent Inappropriate Relationships Between Student-Athletes and Athletics Department Personnel*, NCAA INCLUSION, https://www.ncaapublications.com/productdownloads/SIB13.pdf (last visited Apr. 10, 2024).

[6]      Women's Sport's Foundation, Definitions of Sexual Harassment and/or Romantic Relationship https://www.womenssportsfoundation.org/wp-content/uploads/2016/08/sexual-harassment-sexual-harassment-and-sexual-relationships-between-coaches-other-athletic-personnel-and-athletes-the-foundation-position.pdf

47.     Ignoring these credible allegations of inappropriate sexual conduct, UK failed to follow up or investigate, instead, retaining Jorgensen as the Associate Head Coach for the University's Swimming and Diving Program and priming him to assume the Head Coach position, once Conelly retired.

**III.     2013 – 2023: The University of Kentucky Promoted Jorgensen to the position of Head Coach of the University's Swimming and Diving Program and Allowed Him to Sexually Harass, Abuse, and Assault Student-Athletes and Coaches.**

48.     In May of 2013, UK promoted Jorgensen to the position of Head Coach of the University's Swimming and Diving Program, a position he held until 2023.

49.     Throughout his tenure at the University of Kentucky, Jorgensen exploited his position of power, fostering an unhealthy, sexualized environment for the women's swim team, grooming female athletes with the intention of committing future sexual abuse, and sexually assaulting and violently raping members of his female coaching staff that he directly supervised.

50.     For ten years, not only did members of the Athletic Department routinely witness Jorgensen's sexually inappropriate and abusive behavior, but credible allegations of inappropriate sexual allegations were made to UK's Athletic Department and Title IX Office, all of which were ignored or rebuffed.

51.     UK disregarded Jorgensen's behavior and the risk he posed to the University's coaches and student-athletes.

14

52.     UK purposefully disregarded Jorgensen's sexually inappropriate behavior and related allegations, initially, because of his prior success with other struggling swim programs and the promise he held for UK, and, later, because of the tremendous success he brought to UK's swim program.

53.     In 2021, Swimming World characterized Jorgensen's career at UK to that point:

> "When Lars Jorgensen was hired as head coach of the University of Kentucky in 2013, the program was one of the bottom feeders of the stacked Southeastern Conference. In his first season in Lexington in 2014, the team was 10th in the conference, and had only been higher than fourth once – a third place finish in 1999. The Wildcats weren't a destination for the nation's top recruits and certainly didn't have a reputation on the national stage.
>
> So in his eighth season with the program, it was understandable why it was such a huge achievement to come home with the SEC women's title."[7]

54.     Because Jorgensen transformed UK's lackluster Swimming and Diving Program into an elite program, UK was purposefully indifferent to Jorgensen's behavior – unhealthy, sexual, and otherwise – and any allegations of inappropriate sexual behavior.

---

[7]     Andy Ross, *How Lars Jorgensen Built an SEC Winning Program at Kentucky*, SWIMMING WORLD (Mar. 11, 2021), https://www.swimmingworldmagazine.com/news/how-lars-jorgensen-built-an-sec-winning-program-at-kentucky/#:~:text=When%20Lars%20Jorgensen%20was%20hired,third%20place%20finish%20in%201999.

55.     By way of example, UK failed to take any action in response to Coach Howard's credible allegations of inappropriate sexual behavior against Jorgensen in 2012 and 2013.

56.     Coach Howard's allegations were set forth in a wrongful termination lawsuit filed in 2014 by a former Head Softball Coach at the University of Toledo, which was heavily publicized.[8]

57.     Despite allegations of inappropriate sexual behavior against Jorgensen stemming from his tenure at the University of Toledo coming from two different sources, UK, again, failed to take any action in 2014.

58.     UK's Title IX Office also received a complaint regarding Jorgensen in in 2015 or 2016.

59.     UK, likewise, failed to take any action in response to the 2015/2016 complaint made against Jorgensen.

60.     In August of 2019, the Title IX Coordinator at San Jose State University forwarded an e-mail to UK's Title IX Office detailing two complaints against Jorgensen, which the University classified as "Sexual Assault, Sexual Assault-Rape."

---

[8]     Doug Brown, *Former Toledo Softball Coach Sues School For Discrimination, Calls Out Other Coaches and Administrator For Relationships With Students And Subordinates*, CLEVELAND SCENE (Oct. 22, 2014), https://www.clevescene.com/news/former-toledo-softball-coach-sues-school-for-discrimination-calls-out-other-coaches-and-administrator-for-relationships-with-students-and-sub-4396868.

61.    One of the complaints provided by San Jose State University detailed the assaults suffered by Assistant Coach Jane Doe II, set forth below, who was repeatedly assaulted by Jorgensen during her tenure at UK.

62.    Again, UK failed to take any action in response to the 2019 complaints.

63.    As a result, Jorgensen was empowered to create an unhealthy, sexualized environment for the women's swim team, groom female athletes with the intention of committing future sexual abuse, and sexually assault and violently rape members of his female coaching staff that he directly supervised.

## A. Lars Jorgensen Repeatedly and Violently Sexually Assaulted Assistant Coach Jane Doe II.

64.    Upon being promoted to the position of Head Coach in 2013, Jorgensen, then 42-years-old, recruited a recent female graduate, Jane Doe II, age 22, to the position of Assistant Coach of the University's Swimming and Diving Program.

65.    In December of 2013, Jorgensen hosted the program's coaching staff for a Christmas Party at his home.

66.    At the conclusion of the party, Jorgensen isolated Jane Doe II under the pretense of asking her to remain behind to help clean up.

67.    Once alone, Jorgensen grabbed Jane Doe II from the kitchen, dragged her into his bedroom, and forcibly raped her.

68.     Jane Doe II screamed and verbally told Jorgensen "no" and to "stop," but Jorgensen did not stop his assault.

69.     The following morning, Jorgensen appeared at Jane Doe II's door with flowers and chocolate, crying and promising that he would never assault her again.

70.     Despite his promise, from 2013 to 2016, Jorgensen repeatedly sexually assaulted Jane Doe II over the course of her tenure at UK:

   **a)** Jorgensen groped Jane Doe II's thighs under the table during staff dinners;

   **b)** Under the guise of needing to discuss swim practice, Jorgensen frequently asked Jane Doe II into his office, only for him to lock the door and masturbate in front of her; and

   **c)** Jorgensen forcibly raped Jane Doe II numerous times.

71.     Upon information and belief, members of UK's Athletics Department were aware of Jorgensen's inappropriate sexual behavior toward Jane Doe II.

72.     On one occasion, in approximately 2015 or 2016, UK's Head Volleyball Coach Craig Skinner ("Skinner"), observed Jorgensen groping Jane Doe II's thigh, visibly without her consent, and reported this to the Director of Operations for the Swimming and Diving Program, Margo Greeman ("Greeman").

73.     Upon receiving this report, Greeman confronted Jorgensen.

74.     Jorgensen, in turn, denied the allegation and confronted Jane Doe II, threatening her that, if she reported him, he would ruin her coaching career.

75.     Upon information and belief, either Greeman or Skinner reported this incident of Jorgensen groping Jane Doe II to the Title IX Office at UK.

76.     Documents from UK's Title IX Office refer to a complaint regarding Jorgensen from 2015 or 2016, demonstrating the Office's receipt of a complaint.

77.     Despite the credible allegation of sexual assault against Jorgensen, UK's Title IX Office did not investigate the allegations or document the report.

78.     The Title IX Office is required to investigate every allegation of sexual assault it receives.

79.     No one from the Title IX Office contacted Jane Doe II about the assault, until years later and these allegations were renewed.

80.     As a result, Jorgensen was empowered to create an unhealthy, sexualized environment for the women's swim team, groom female athletes with the intention of committing future sexual abuse, and sexually assault and violently rape members of his female coaching staff that he directly supervised.

**B. Lars Jorgensen Spent Years Grooming Briggs Alexander (formerly Bridgette Alexander), Creating a Sexually Hostile Environment, Sexually Assaulting and Violently Raping Him.**

81.     In 2013, Briggs Alexander (formerly Bridgette Alexander)[9] was a

---

[9]     Today, Plaintiff Briggs Alexander identifies as male and uses "he" and "him" pronouns. However, at the time of most of the allegations set forth in this Complaint, Alexander identified as female. Accordingly, when allegations pertain to Alexander's past female-self, he will be referred to as female and with female pronouns; when Alexander began transitioning to male, and up to the present tense, he will be referred to as male and with male pronouns.

junior in high school with collegiate athletic scholarship opportunities and aspirations to qualify for the Olympic Swim Team.

82.    Jorgensen, as the newly minted Head Coach of UK's Swimming and Diving Program, targeted Alexander as one of his top recruits, visiting her home in Wisconsin, getting to know her family, and suggesting that, under his tutelage, Alexander could achieve her goal of someday qualifying for the Olympics, as he had.

83.    By October of 2013, Jorgensen offered Alexander an athletic scholarship that covered 92% of her college expenses and assured her that she could earn a full scholarship if she performed well. Alexander accepted.

### a) 2014 – 2017: University Employees Observe Jorgensen's Grooming and Exertion of Control over Alexander.

84.    In June of 2014, after graduating high school and when she was still a minor of 17-years-old, Alexander moved to UK and began training for the upcoming swim season.

85.    Over the course of several years, Jorgensen abused that trust and actively "groomed" Alexander;[10] Jorgensen isolated Alexander, sought to gain her trust, strove to control every facet of her life, and repeatedly made sexualized comments in an attempt to desensitize sexual topics.

---

[10]    *Grooming: Know the Warning Signs*, RAINN (Jul. 10, 2020), https://www.rainn.org/news/grooming-know-warning-signs.

### i. Jorgensen Sought to Gain Alexander's Trust.

86.    Soon after she moved to UK, Jorgensen, then 43-years-old, purposefully asserted himself as a fatherly figure to Alexander; appearing as attentive to Alexander and invested in her goals.

87.    Jorgensen likewise presented himself as the key for Alexander to achieve her goals as a collegiate athlete and to someday qualify for the Olympics, routinely asserting that if Alexander followed his directives, without question, then she would achieve her goals.

88.    Because of Jorgensen's successful swim career and the inherent trust Alexander had in Jorgensen as her coach, Alexander believed him.

### ii. Jorgensen Asserted Control Over Alexander.

89.    Believing that Jorgensen was critical to her future success placed him in the ideal position to assert control over Alexander.

### a. Jorgensen Controlled Alexander's Food Intake, Body Perception, and Overall Health.

90.    Jorgensen continually pressured Alexander and her teammates, privately and in front of program nutritionists and coaches, to lose weight under the guise of becoming more "fit" and performing better.

91.    Jorgensen directed Alexander to lead the other female swimmers in a "running club" for the express purpose of losing weight.

92.    Jorgensen directed swimmers, including Alexander, to keep food logs recording everything they ate, which he would routinely review and admonish anyone for purportedly "over-eating."

93.    Jorgensen further kept tabs on the team's menstrual cycles, routinely asking swimmers, including Alexander, whether she continued to have her period and, if so, how heavy the flow was.

94.    Jorgensen's interest in the female swimmers' menstrual cycles was due to his directive to the team to lose weight; "[s]tarvation stops your body from producing this hormone [estrogen], and without it, your body can't start the ovulation and menstruation cycle."[11]

95.    Jorgensen's preoccupation with the swimmers' food consumption, weight, and body fat led many on the UK women's swim team to develop eating disorders, as well as associated mental health ailments, such as anxiety and depression,[12] which, in turn, resulted in irregular or prolonged lapses in swimmers' menstrual cycles.

96.    By way of example, because of Jorgensen's control over her food intake and repeated directive to lose weight, during Alexander's collegiate career, she

---

[11]    *Anorexia and Amenorrhea: What are the Consequences?*, EATING DISORDER Hope, https://www.eatingdisorderhope.com/information/anorexia/anorexia-amenorrhea (last visited Apr. 10, 2024).

[12]    Johanna Sander et al., *Depression, Anxiety and Eating Disorder-Related Impairment: Moderators in Female Adolescents and Young Adults*, INT. J. ENV'T. RSCH. & PUB. HEALTH (Mar. 18, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7967486/pdf/ijerph-18-02779.pdf (finding a strong association between anxiety/depression and eating-disorder-related impairment).

typically maintained a body fat percentage between 11% and 13%, rendering her severely underweight,[13] which likewise resulted in the loss of her menstrual cycle for approximately one year.

97.    University employees associated with the Swimming and Diving Program were fully aware of the unhealthy levels of weight loss plaguing the female swimmers, including Alexander.

98.    By way of example, Head Nutritionist Monica Fowler ("Fowler") oversaw the team's Bod Pod tests – measuring the athletes' body fat percentages – and logged those results for athletes, including Alexander.

99.    As a professional nutritionist, Fowler knew that a body fat percentage of 11%, 12%, or 13% for a female athlete, including Alexander, was dangerously unhealthy.

100.    Despite knowledge of Jorgensen's dangerous dietary directives and the impact it was having on athletes like Alexander, Fowler did not intervene.

### b. Jorgensen Sought to Control Every Aspect of Alexander's Personal Life.

101.    Jorgensen sought to assert control over Alexander's personal life, repeatedly asking Alexander what her plans were, where she went, and who she spent her time with.

---

[13] *Assessing Your Weight*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/index.html#:~:text=If%20your%20BMI%20is%20less,falls%20within%20the%20obese%20range (last visited Apr. 10, 2024).

102.   As a means of asserting control in her personal life, Jorgensen called Alexander on a daily basis, typically several times a day, despite having routinely interfaced with Alexander at practice.

103.   If Alexander did not answer Jorgensen's phone call, Jorgensen was visibly angry when Alexander next spoke with him and would often punish her by embarrassing her at practice or behaving in a cold and distant manner.

### c. Jorgensen Sought to Control Alexander Through Emotional Abuse.

104.   Jorgensen often threatened that if Alexander did not do as exactly as he directed, then she would not make the Olympic team.

105.   Jorgensen publicly berated Alexander in front of the team and coaches, screaming and swearing and calling her "a piece of shit."

106.   Jorgensen alternated these outbursts of anger and public embarrassment with periods of intense praise and reinforcement.

107.   This pattern of unpredictable behavior was intended to keep Alexander on edge and to repeatedly re-assert Jorgensen's control.

### iii.  Jorgensen Sought to Control Alexander Through Isolation.

108.   Beginning in Alexander's freshman year at UK, Jorgensen manipulated Alexander in order to isolate her from the rest of her team.

109.   Jorgensen purposefully encouraged Alexander to demean her teammates and pressure them to lose weight, under the guise of fulfilling her role as

a team leader, knowing that doing so would drive a wedge between Alexander and the rest of her team.

110. Jorgensen likewise alternated between publicly contrasting Alexander's success with her teammates' purported failures and punishing the entire team for any perceived shortcoming in Alexander's performance in order to divide Alexander from the rest of her team.

### iv. Jorgensen Fostered a Sexualized Environment to Normalize His Behavior.

111. Jorgensen routinely made sexualized comments, while alone with Alexander and in front of other swimmers and coaches, including the following:

A. Jorgensen frequently commented on Alexander's and other swimmers' bodies and appearance;

B. Jorgensen asked Alexander if she saw the other girls in the locker room naked;

C. Jorgensen routinely made sexual "jokes" such as jokes referencing "big dicks";

D. Jorgensen asked Alexander what she wore to bed;

E. Jorgensen frequently commented on women's breasts with comments such as, "Did you see the rack on that girl?"

F. Jorgensen shared personal sex stories;

G. Jorgensen talked about women that he wanted to have sex with;

H. Jorgensen asked Alexander and other swimmers about their sexual experiences;

I.   Jorgensen asked Alexander whether she was on birth control;

J.   Jorgensen frequently opined which swimsuits were his favorite based on how they fit an athlete;

K.  Jorgensen commented that Alexander's "butt looked good";

L.   Jorgensen commented on Alexander's breast size; and

M. Jorgensen frequently asked if anyone on the swim team was "hooking up" and speculated on who might be.

**b) 2017 – 2018: Jorgenson's Inappropriate Behavior Escalates.**

112.   By the Summer of 2017, Alexander, age 20, was beginning to plan what she would do following her final year of collegiate-athlete eligibility at the conclusion of the season in 2018 and exploring the possibility of coaching.

113.   Jorgensen, age 46, assured Alexander that he would help her with this transition.

114.   Under the pretense of assisting Alexander, Jorgensen began asking her to meet regularly him at Drake's, a local restaurant chain, to discuss resume building and her future in coaching.

115.   During the monthly meetings at Drake's, Jorgensen increased his physical contact with Alexander: hugging her, kissing her forehead, putting his arm around her, sitting very close to her so that their legs were pressed against one another, and trying to play footsie under the table.

116.    Alexander repeatedly rebuffed his advances both verbally and through physical cues, which Jorgensen ignored.

117.    Around this time and while continuing the grooming behavior set forth above, Jorgensen escalated his behavior and became more sexually aggressive.

118.    Jorgensen repeatedly asked Alexander sexually explicit questions, such as whether she had masturbated, had sex, or viewed pornography.

119.    When Alexander chose not to participate in the discussion, Jorgensen would become irate and threaten her career and future.

120.    While on the phone with Alexander, Jorgensen would suddenly begin masturbating and repeatedly asked Alexander to masturbate, so that he could listen.

121.    When Alexander refused to participate or attempted to change the topic, Jorgensen would again become angry, shaming Alexander and gaslighting her, telling her that she was nothing without him and that she owed her career to him. Alexander either ended the call and chose to endure the violent and harassing consequence the next day, or pretended to masturbate so that Jorgensen would leave her alone.

122.    Jorgensen continuously pressured Alexander to send him nude photographs and, likewise, sent Alexander unsolicited photos of his erect penis and videos of him masturbating.

123.   If Alexander refused to respond to one of Jorgensen's sexually explicit questions or requests, Jorgensen would confront her at the next practice, berating her, with her team and coaching staff in view.

124.   As the meetings at Drake's continued, over the course of several months and under the pretense of "professional development," Jorgensen became increasingly aggressive, possessive, and controlling, pressuring Alexander to drink alcohol and forcefully walking Alexander to her car, and occasionally getting into her car as well, under the guise of helping her.

**c) 2018 – 2019: Jorgensen Repeatedly Sexually Assaulted Alexander.**

125.   In the Spring of 2018, Alexander ended her collegiate swim career, but continued to train as an elite swimmer and a member of the National Swim Team, while simultaneously attending UK to obtain a Master's Degree.

126.   In order to continue to train at UK facilities, Alexander was required to retain an official connection to the Swimming and Diving Program.

127.   Accordingly, when Jorgensen offered Alexander a position as a Volunteer Assistant Coach, Alexander accepted.

128.   As a Volunteer Assistant Coach, Alexander reported to Jorgensen.

129.   Jorgensen continued to engage in the behavior that characterized their relationship: he routinely made sexually explicit comments and requests; he sought

to control menial facets of Alexander's life, including who she spent time with and her eating habits; and continually threatened that without him she would fail.

130. However, Jorgensen's behavior escalated.

131. During their now weekly dinners at Drake's, which continued to take place at Jorgensen's request under the pretense of "professional development," Jorgensen became increasingly sexually aggressive:

    a. Jorgensen began groping Alexander's thighs, waist, and stomach;

    b. Jorgensen fondled his erect penis through his clothes, showing Alexander "how hard he was;"

    c. Jorgensen physically assaulted Alexander, touching her genitalia between her pants and underwear, under the table.

132. When Alexander objected to the behavior verbally and pulled away from Jorgensen, Jorgensen would forcibly pull her back, ignoring her protests by telling her, "You know you like it."

133. Jorgensen continued his habit of walking Alexander to her car when they left Drake's, but now, he forced himself into her car.

134. While in the car, Jorgensen would continue assaulting Alexander, groping her breasts and kissing her on the mouth.

135. When Alexander, again, tried to pull away, Jorgensen would forcibly pull her back to him, repeating, "You know you like it."

136.   After nearly every assaultive encounter, Jorgensen followed up with a phone call to Alexander and threatened that if she ever told anyone, no one would believe her, and that she would not be hired anywhere else.

137.   Alexander believed Jorgensen because colleagues on the coaching staff had witnessed Jorgensen assault her approximately three different times, but Jorgensen was undeterred.

138.   By way of example, on one occasion, Jorgensen arranged for the full staff to meet at Drake's.

139.   While there, Jorgensen drunkenly groped the inside of Alexander's thigh, as she sat next to him, working his hand up to grope between her legs.

140.   Associate Head Coach Maclin Simpson ("Simpson") saw what was happening and pulled Jorgensen off Alexander, but Associate Head Coach Michael Camper ("Camper") and Assistant Swim Coach Jordan Lieberman ("Lieberman") merely watched from across the table.

141.   On at least two other occasions, Simpson, Camper, and Lieberman were present at Drake's and observed Jorgensen groping Alexander, without her consent, and each time they simply laughed it off.

### d) 2019 – 2023: Jorgensen Escalates to Forcible Rape.

142.   Jorgensen's unrelenting sexual harassment and abuse took a significant toll on Alexander's body, both mentally and physically, ultimately compelling her to retire from elite swimming in December of 2019.

143.   Following the end of her swim career, Alexander was determined to obtain her Master's Degree from UK and develop a career as a collegiate swim coach.

144.   Jorgensen, age 49, assured Alexander, age 22, that he would help her in her chosen career and Alexander was reliant on his assistance.

i.   December of 2019: Jorgensen Forcibly Rapes Alexander.

145.   In December of 2019, Jorgensen hosted the program's coaching staff for a Christmas Party at his home.

146.   As with Jane Doe II six years before, at the conclusion of the party, Jorgensen isolated Alexander under the pretense of asking her to remain behind to help clean up.

147.   Once alone, Jorgensen began groping Alexander and pulling her clothes off.

148.   Alexander tried to pull away and telling him to stop, but Jorgensen pulled Alexander into his bedroom, pinned her to the bed by her wrists and forcibly raped her.

149.   Following the rape, Alexander tried to quickly escape Jorgensen's house.

150.   Jorgensen followed Alexander, painfully grabbed her arm and threatened, "If you tell anyone, I'll ruin your reputation. I'll tell everyone you wanted to have sex with a 50-year-old. I know you liked it."

151.   Terrified of Jorgensen and the consequences to her chosen career path, Alexander agreed not to tell anyone.

ii.   March of 2020: Jorgensen Forcibly Rapes Alexander for a Second Time.

152.   In March of 2020, Alexander was planning for the next phase of her career, following her upcoming graduation with her Master's Degree.

153.   Alexander was applying for jobs and reliant on Jorgensen as her coach and employer.

154.   Sometime in March of 2020, Jorgensen asked Alexander to come to his house, so they could review her resume and discuss career options.

155.   Jorgensen assured Alexander that he would not touch her, saying "You know I love you, I'd never hurt you."

156.   Despite his assurances, once Alexander and Jorgensen were sitting together, reviewing her resume, Jorgensen began groping Alexander.

157.   Alexander pulled away from Jorgensen and attempted to push him away.

158.   Jorgensen overpowered Alexander, pulled her into his bedroom, pushed her down onto the bed, and pinning her down onto the bed by her neck.

159.   Jorgensen choked Alexander by the neck and taunted her saying, "Now you can't talk."

160.   Jorgensen forcibly raped Alexander.

161.   Following the rape, Jorgensen, again, would not allow Alexander to leave until she promised not to tell anyone, tightly gripping her wrist until she agreed.

162.   Terrified of Jorgensen and the consequences to her chosen career path, Alexander agreed not to tell anyone.

        iii.   Spring of 2020: Jorgensen Forcibly Rapes Alexander for a Third Time.

163.   In the Spring of 2020, Jorgensen again invited Alexander to his home under the auspices of discussing her career development.

164.   On this occasion, Jorgensen repeatedly urged Alexander to consume alcohol. Alexander repeatedly tried to refuse.

165.   Catching her unaware, Jorgensen pushed Alexander onto his couch, pinned her wrists, effectively rendering her immobile, and forcibly raped her.

166.   Following the assault, Jorgensen, again, threatened Alexander not to tell anyone.

> iv. May of 2020 – July of 2021: Alexander Leaves UK for the University of Buffalo and Jorgensen Continues to Sexually Harass Her.

167.   In May of 2020, Alexander graduated with her master's degree and was offered a coaching job at the University of Buffalo. Alexander accepted the position.

168.   While at the University of Buffalo, Jorgensen continued to sexually harass her, asking Alexander to send photos and videos of her having sex with her girlfriend.

169.   Alexander did not comply with Jorgensen's requests.

170.   In March of 2021, Jorgensen attempted to sexually assault Alexander while at the same hotel for a swim meet, grabbing her arm and attempting to place her hand on his penis.

171.   Alexander was able to reach the door and escape Jorgensen.

> v. July of 2021: Alexander Returns to UK as an Assistant Coach, Where Jorgensen Resumes Sexually Harassing and Assaulting Her.

172.   In April of 2021, Jorgensen began calling Alexander on a regular basis promising that if she returned to coach at UK, he would launch her career as a swim coach and provide her with benefits and pay.

173.   Jorgensen further promised repeatedly that he would maintain a professional relationship with her.

174.   Alexander, unhappy at the University of Buffalo and armed with Jorgensen's promise he would maintain a professional relationship with her, agreed to accept the position which was certain to be an excellent launching pad for her chosen career.

175.   In July of 2021, Alexander returned to the University of Kentucky as an Assistant Swim Coach.[14]

176.   As an Assistant Coach, Alexander reported directly to Jorgensen.

177.   Despite his promises, Jorgensen ultimately returned to the illegal behavior that characterized their relationship: he routinely made sexually explicit comments; he sought to control menial facets of Alexander's life, including his appearance; and continually threatened that without him he would fail.

178.   Based on Jorgensen's actions as described below, submitting to his sexual demands was a term and condition of Alexander's employment.

179.   Jorgensen, likewise, resumed sexually assaulting Alexander.

180.   Jorgensen arranged for staff dinners at Drake's.

181.   While there, Jorgensen routinely groped Alexander's thigh and put his hands on his waist and shoulders, despite Alexander's verbal objections and consistent physical cues.

---

[14]      Around this time, Alexander began transitioning to a man. Accordingly, Alexander will be referred to with male pronouns.

182.    The program's coaching staff observed Jorgensen's behavior, but did not intervene.

183.    After staff dinners, Jorgensen resumed his habit of walking Alexander to his car and forced himself into his car.

184.    While in the car, Jorgensen would attack Alexander, groping his breasts, forced kissing him on the mouth, and fondling his genitalia.

185.    Jorgensen was visibly hostile to Alexander's gender transition and became increasingly more aggressive with him.

186.    Fearful that Jorgensen would grow more violent if he resisted, Alexander instinctively dissociated during these instances of assault.[15]

      vi. December of 2021: Jorgensen Forcibly Rapes Alexander for a Fourth Time.

187.    In December of 2021, Jorgensen hosted the program's coaching staff for a Christmas Party at his home.

188.    As with Jane Doe II eight years before, and Alexander two years before, at the conclusion of the party, Jorgensen isolated Alexander under the pretense of asking him to remain behind to help clean up.

189.    Once alone, Jorgensen forcibly raped Alexander.

---

[15]    *Dissociation*, RAINN, https://www.rainn.org/articles/dissociation (last visited Apr. 12, 2024).

190.    Jorgensen told Alexander words to the effect that he needed to remind him "what it was like to be submissive like a girl."

191.    Following the assault, Jorgensen joked that Alexander "knew the drill," which Alexander took to be a reference to Jorgensen's typical threat that followed his prior sexual threats.

vii. May 4, 2022: Alexander Resigns from Coaching as a Direct Result of Jorgensen's Sexual Harassment and Abuse.

192.    After approximately ten months of suffering a pervasive sexually hostile work environment, repeated sexual assaults, and a violent rape, Alexander could no longer cope in his employment situation and, consequently, left his position as an Assistant Coach.

193.    Because of the severe long-term, trauma he had experienced, Alexander left the swimming world and changed career paths.

194.    However, despite Alexander's separation from UK's Swimming and Diving Program, Jorgensen continued to sexually harass Alexander.

195.    Jorgensen continued to send Alexander text messages with sexually explicit questions, such as, "Don't you remember how good I felt?"

196.    Desperate for the harassment to stop, Alexander attempted to confront Jorgensen in-person, pleading that he stop contacting him.

197.   Jorgensen apparently disregarded this request and, instead, kissed Alexander without his consent, and subsequently continued texting him.

198.   Alexander attempted to confront Jorgensen in-person a second time, and, again, Jorgensen ignored Alexander and, instead, groped Alexander under the table.

199.   Jorgensen continued to contact Alexander over the following months, making unsolicited sexual comments, despite Alexander's request that he stop.

> viii. April 13, 2023: Jorgensen Forces Alexander to Perform Oral Sex for the Second Time.

200.   On April 13, 2023, Alexander made one final attempt to convince Jorgensen to stop contacting him.

201.   Alexander met Jorgensen at Drake's and, again, pleaded that he leave him alone.

202.   After dinner, Jorgensen put his arm around Alexander, forcefully directing Alexander to his car.

203.   Once in front of Alexander's car, Jorgensen forced himself inside despite Alexander's protestations.

204.   Inside the car, Alexander told Jorgensen that he would call the police.

205.   Jorgensen grew visibly angry and struck Alexander.

206.   Jorgensen forcefully kissing Alexander and fondled his breasts despite Alexander's protestations.

207.   Jorgensen then forced Alexander to perform oral sex on him.

208.   Fearful that Jorgensen would grow more violent if he resisted, Alexander instinctively dissociated during these instances of assault.

209.   Afterward, Alexander resolved to report Jorgensen to the University.

## C. Lars Jorgensen Spent Years Grooming Jane Doe, Creating a Sexually Hostile Environment, and Escalating His Behavior to Ultimately Sexually Assault Her.

210.   In 2016, Jane Doe was a senior in high school with collegiate athletic scholarship opportunities and aspirations to qualify for the Olympic Swim Team.

211.   Jorgensen, as the Head Coach of UK's Swimming and Diving Program, targeted Jane Doe as one of his top recruits, visiting her home in Pittsburgh, getting to know her family, and suggesting that, with his help, Jane Doe could achieve her goal of someday qualifying for the Olympics, as he had.

212.   By September of 2016, Jorgensen offered Jane Doe an athletic scholarship that covered 80% of her college expenses and assured her that she could earn a full scholarship if she performed well. Jane Doe accepted.

### a. 2017 – 2022: Jorgensen Groomed Jane Doe in View of University Employees.

213.   In June of 2017, after graduating high school and when she was just 18-years-old, Jane Doe moved to UK and began training for the upcoming swim season.

214.   Over the course of several years, Jorgensen actively "groomed" Jane Doe;[16] Jorgensen isolated Jane Doe, sought to gain her trust, strove to control facets of her life, and repeatedly made sexualized comments in an attempt to desensitize sexual topics.

### i.   Jorgensen Sought to Gain Jane Doe's Trust.

215.   Soon after she moved to UK, Jorgensen, then 46-years-old, purposefully asserted himself as a fatherly figure to Jane Doe; appearing as attentive to Jane Doe and invested in her goals.

216.   Jorgensen likewise presented himself as the key for Jane Doe to achieve her goals as a collegiate athlete and to someday qualify for the Olympics, routinely asserting that if Jane Doe followed his directives, without question, then she would achieve her goals.

217.   Because of Jorgensen's successful swim career and the inherent trust Jane Doe had in Jorgensen as her coach, Jane Doe believed him.

### ii.   Jorgensen Asserted Control Over Jane Doe.

218.   Believing that Jorgensen was critical to her future success placed him in the ideal position to assert control over Jane Doe.

---

[16]   *Grooming: Know the Warning Signs*, RAINN (Jul. 10, 2020), https://www.rainn.org/news/grooming-know-warning-signs.

a) **Jorgensen Controlled Jane Doe's Food Intake, Body Perception, and Overall Health.**

219.   Jorgensen continually pressured Jane Doe and her teammates, privately and in front of program nutritionists and coaches, to lose weight under the guise of becoming more "fit" and performing better.

220.   Jorgensen repeatedly commented on Jane Doe's body and his desire that she lose weight.

221.   On at least one occasion, Jorgensen told Jane Doe that she reminded him of the "fat people that walked around the mall," because she was a "snacker."

222.   Jorgensen routinely asked Jane Doe what she was eating and advised her as to what she should be eating.

223.   Jorgensen repeatedly encouraged Jane Doe to reduce her body fat percentage from between 21% and 22% to 16%.

224.   A body fat percentage of 16% for a female athlete, including Jane Doe, is dangerously unhealthy.[17]

225.   Jorgensen's preoccupation with the swimmers' food consumption, weight, and body fat led many on the UK women's swim team to develop eating

---

[17]   *Assessing Your Weight*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/index.html#:~:text=If%20your%20BMI%20is%20less,falls%20within%20the%20obese%20range (last visited Apr. 10, 2024).

disorders, as well as associated mental health ailments, such as anxiety and depression.[18]

226.   By way of example, because of Jorgensen's control over her food intake and repeated directive to lose weight, during Jane Doe's collegiate career, she developed an eating disorder and dropped down to a body fat percentage of 16%, rendering her severely underweight.

227.   University employees associated with the Swimming and Diving Program were aware of the eating disorders and unhealthy levels of weight loss plaguing the female swimmers, including Jane Doe.

228.   By way of example, Head Nutritionist Monica Fowler ("Fowler") oversaw the team's Bod Pod tests – measuring the athletes' body fat percentages – and logged those results for athletes, including Jane Doe.

229.   As a professional nutritionist, Fowler knew that a body fat percentage of 16% for a female athlete, including Jane Doe, was dangerously unhealthy.

230.   Jane Doe further disclosed to Fowler that she was binging and purging in order to meet Jorgensen's directives.

231.   Despite knowledge of Jorgensen's dangerous dietary directives and the impact it was having on athletes like Jane Doe, Fowler did not intervene.

---

[18]   Johanna Sander et al., *Depression, Anxiety and Eating Disorder-Related Impairment: Moderators in Female Adolescents and Young Adults*, INT. J. ENV'T. RSCH. & PUB. HEALTH (Mar. 18, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7967486/pdf/ijerph-18-02779.pdf (finding a strong association between anxiety/depression and eating-disorder-related impairment).

### b) Jorgensen Sought to Control Jane Doe's Personal Life, Subjecting Her to Constant Communication.

232.   Jorgensen sought to assert control over Jane Doe's personal life, repeatedly asking Jane Doe what her plans were, where she went, and who she spent her time with.

233.   As a means of asserting control in her personal life, Jorgensen called Jane Doe on a daily basis, typically several times a day, despite having routinely interfacing with Jane Doe at practice.

234.   If Jane Doe did not answer Jorgensen's phone call, Jorgensen verbally reprimanded Jane Doe.

235.   Jorgensen told Jane Doe, "When I call you, you need to answer me, because one day when your boss calls you will need to answer. I am your boss right now."

### c) Jorgensen Sought to Control Jane Doe Through Emotional Abuse.

236.   Jorgensen publicly berated Jane Doe in front of the team and coaches, screaming and swearing stating "You are not worth any of the fucking [scholarship] money that we gave you!"

237.   Jorgensen alternated these outbursts of anger and public embarrassment with periods of intense praise and reinforcement.

238.   This pattern of unpredictable behavior was intended to keep Jane Doe on edge and to repeatedly re-assert Jorgensen's control.

### iii. Jorgensen Fostered a Sexualized Environment to Normalize Sexual Content and Behavior.

239.   Jorgensen routinely made sexualized comments, while alone with Jane Doe and in front of other swimmers and coaches, including the following:

   i.   Jorgensen frequently commented on Jane Doe's and other swimmers' bodies and appearance;

   ii.   Jorgensen routinely made sexual "jokes";

   iii.   Jorgensen frequently commented on women's breast and buttocks;

   iv.   Jorgensen shared personal sex stories;

   v.   Jorgensen talked about women that he wanted to have sex with;

   vi.   Jorgensen asked Jane Doe and other swimmers about their sexual experiences;

   vii.   Jorgensen asked Jane Doe whether she was having sex with her boyfriend;

   viii.   Jorgensen commented that Jane Doe was "beautiful";

   ix.   Jorgensen commented that Jane Doe "looked great";

   x.   Jorgensen made sexually suggestive comments on the body of the teenage daughter of a friend;

   xi.   Jorgensen frequently asked if anyone on the swim team was "hooking up" and speculated on who might be.

### b. 2022: Jorgensen's Behavior Escalates.

240.   In 2022, Jane Doe completed her final year of collegiate-athlete eligibility and returned to UK as a Volunteer Assistant Coach, while she simultaneously completed her undergraduate degree.

241.   As a Volunteer Assistant Coach, Jane Doe reported to Jorgensen.

242.   Jorgensen continued to engage in the behavior that characterized their relationship: he routinely made sexually explicit comments; he sought to control menial facets of Jane Doe's life, including her weight and appearance; and continually discouraged her from seeking other jobs or connections, assuring her that she would have a coaching position at UK.

243.   However, Jorgensen's behavior escalated and through his words and actions as set forth below, Jorgensen's sexual demands became a term and condition of Jane Doe's employment.

244.   In November of 2022, while at a mid-season meet, Jorgensen, age 50, followed Jane Doe, age 22, to her hotel room, asked if he could come in, only to lay on her bed in the apparent suggestion that they have sex.

245.   Jane Doe firmly advised Jorgensen that she was "going to bed," and asked him to leave. Jorgensen complied.

### c. December 28, 2022: Jorgensen Sexually Assaulted Jane Doe.

246.   On December 28, 2022, Jorgensen asked Jane Doe to meet him at his house, so they could then go to a restaurant near his home.

247.   When Jane Doe arrived at Jorgensen's home, Jorgensen asked Jane Doe to come inside under the pretense of wanting to show her a book he was writing.

248.   Once in the house, Jorgensen offered Jane Doe an alcoholic beverage and urged her to drink.

249.   At the restaurant, Jorgensen continued to encourage Jane Doe to drink alcohol.

250.   Upon returning to Jorgensen's home, Jorgensen, again, urged Jane Doe to drink alcohol.

251.   Jorgensen sat close to Jane Doe on the couch and made a series of sexually explicit comments, including:

    **a)** That Jane Doe seemed like the type of person that could have sex with him and not tell anyone the next day;

    **b)** That Jane Doe would be "really into" having sex with him;

    **c)** That his girlfriend wouldn't "get into" sex, like he expected Jane Doe would;

    **d)** That sex with him would be "really good";

    **e)** That he thought Jane Doe would be "really good" at having sex;

    **f)** That Jane Doe should have expected to have sex when she came over to his house.

252.   Jorgensen, likewise, asked Jane Doe a series of sexually explicit questions, including:

    **a)**  Whether she had ever kissed a girl;

    **b)**  Whether he could kiss her, to which Jane Doe said, "no";

    **c)**  Whether they could "make out," to which Jane Doe said, "no";

    **d)**  Whether they could have sex, to which Jane Doe said, "no";

253.   Despite Jane Doe's protestations, Jorgensen groped Jane Doe's thigh, breast, and buttocks and kissed her face and neck.

254.   Jane Doe repeatedly tried to push Jorgensen off of her and to grab a hold of his hands in order to prevent his hands from grabbing her further.

255.   Jorgensen simply laughed it off saying, "Well, what did you expect when you came over here?"

256.   The following day, on December 29, 2022, Jane Doe sent Jorgensen the following text:

> "Lars, I want to let you know that what happened last night was not fun for me. You are a mentor/boss[;] I am a volunteer assistant coach. You have a position of power over me and touching me, asking for sexual favors, and asking sexual questions is unprofessional. I am not attracted to you in any way beyond a coach / professional role. I do not want you to pursue me in any sexual or harassing way again."

257.   Jorgensen promptly responded with two text messages: "Ok can I meet u dinner quickly[?]" and immediately thereafter "Or just 430 Starbucks?"

258.   Jane Doe responded: "I don't want to meet up. I just wanted to be clear that I did not enjoy what happened and do not want that to happen again."

259.   Jorgensen, in turn, texted: "Agree!!!!"

260.   On January 1, 2023, Jorgensen called Jane Doe crying, apologizing, and professing that he would do anything to regain Jane Doe's trust.

261.   During the phone call, Jorgensen asserted that Simpson was leaving UK and that Jorgensen had planned for Jane Doe to replace Simpson as Assistant Coach.

262.   Jane Doe was determined to develop a career as a collegiate swim coach.

263.   Jorgensen assured Jane Doe that he would help her in her chosen career and Jane Doe was reliant on his assistance.

### d. 2023: Jane Doe Disclosed Her Assault to Numerous University Employees.

264.   On January 31, 2023, Jane Doe accepted a position as an Assistant Swim Coach.

265.   As an Assistant Coach, Jane Doe reported to Jorgensen.

266.   Throughout early 2023, Jane Doe continued to suffer mental and physical manifestation from the trauma of the assault that occurred on December 28, 2022 and the years of enduring a sexually hostile environment.

267.   Throughout this same time, Jorgensen continued to engage in the behavior that characterized their relationship: he routinely made sexually explicit

comments; he sought to control menial facets of Jane Doe's life, including her weight and appearance; and continually threatened that without him she would fail.

### i. May of 2023: Jane Doe Disclosed Sexual Assault to Associate Head Coach Michael Camper.

268.   In May of 2023, Jane Doe disclosed to Associate Head Coach Camper that Jorgensen had been sexually inappropriate with her.

269.   In response, Camper replied that he was "not surprised."

270.   As an Associate Head Coach, Camper was Jane Doe's superior.

271.   Camper did not undertake any follow up measures in response to Jane Doe's allegations, failing to:

   **a)** personally investigate Jane Doe's allegations;

   **b)** escalate Jane Doe's allegations for follow up or investigation; and

   **c)** report Jane Doe's allegations to UK's Title IX Office or the EEO Office of Institutional Equity and Equal Opportunity.

### ii. July 7, 2023: Jane Doe Disclosed Assistant Coach Jarrod Lieberman.

272.   On July 7, 2023, Jane Doe disclosed to Assistant Coach Lieberman that Jorgensen had sexually assaulted her.

273.    In response to Jane Doe's disclosure, Lieberman told Jane Doe that he needed to escalate the matter within the University. Jane Doe agreed.

274.   Lieberman subsequently contacted Sandy Bell ("Bell"), University of Kentucky's Special Assistant to the Athletic Director, and reported Jane Doe's allegations of sexual assault against Jorgensen.

275.   In July of 2023, Bell reported directly to Athletics Director Barnhart.

276.   Bell was unsurprised to hear these allegations of sexual assault against Jorgensen, stating, "Unfortunately, this is not the first time we have heard of this."

277.   Upon information and belief, Bell reported Jane Doe's allegations to Athletics Director Barnhart.

278.   Neither Bell nor Barnhart undertook any follow up measures in response to Jane Doe's allegations, failing to:

    **a)**  personally investigate Jane Doe's allegations;

    **b)**  escalate Jane Doe's allegations for follow up or investigation; and

    **c)**  report Jane Doe's allegations to UK's Title IX Office or the EEO Office of Institutional Equity and Equal Opportunity.

**D. Spring of 2023: Briggs and Jane Doe Report Jorgensen's Sex Harassment and Abuse to the University's Title IX Office.**

279.   In or about the Spring of 2023, upon information and belief, a parent of a UK swimmer approached the NCAA and UK about Jorgensen's behavior towards swimmers, specifically as it relates to abusive and inhumane coaching tactics.

280.   In early May of 2023, Jorgensen was placed on a leave of absence.

281.   At the time, Alexander was a student at UK and Jane Doe had recently left her employment at UK.

**a) University of Kentucky Discourages Alexander from Reporting.**

282.   In May of 2023, Alexander contacted the Title IX office and in response she received a form letter.

283.   In June of 2023, Alexander was contacted by the Title IX Office, specifically to address Jorgensen's coaching tactics.

284.   During the initial interview with Title IX Officer Meredith Reeves ("Reeves"), Alexander addressed Jorgensen's coaching violations.

285.   Alexander also reported to Reeves that he had been groomed, sexually harassed and sexually assaulted by Jorgensen.

286.   During the interview with Title IX Officer Reeves, Alexander addressed Jorgensen's coaching violations.

287.   Alexander also reported that she had been groomed, sexually harassed, and sexually assaulted by Jorgensen.

288.   During this same timeframe, Jane Doe II was interviewed.  During her interview with the Title IX Office, Jane Doe II likewise reported the sexual harassment and assault that she was forced to endure under Jorgensen.

289.   During the meeting, Reeves referenced the 2019 Complaint detailing Jane Doe II's assault which was provided to the Title IX office, although the allegations were never investigated or followed up.

290.   Although meeting with Alexander and Jane Doe II separately, Reeves vigorously discouraged both from formally reporting their abuse, emphasizing the fact that the information they were reporting was "sensitive" and suggesting that they "probably didn't want to tell their story."

291.   As to Plaintiff Alexander, Reeves urged him not to report, advising that Alexander should instead go home and "think about what you are going to start if you choose to file."   Alexander made clear to Reeves that he wished to file the Complaint.

292.   Reeves also informed Alexander and Jane Doe II that in the event Jorgensen left UK, "Title IX would be "unable" to conduct an investigation into the allegations of sexual misconduct so the Title IX process would be "pointless."

293.   Nonetheless, Alexander and Jane Doe II made clear to Reeves that they wished for the Complaint to be filed and that their allegations of sexual assault would be investigated by UK.

294.   During the weeks following their meetings with Title IX and Jorgensen's resignation (June 28, 2023), no action was taken to investigate the claims made against Jorgensen by Alexander and Jane Doe II.

295.   In early October of 2023, Plaintiffs reached out to the Title IX office for an update.

296.   On October 23, 2023, Alexander was contacted by the Title IX Office administrative staff regarding his complaint.  Alexander responded that he met with Reeves in June of 2023 and that he was under the impression that Reeves (who was not on leave until November of 2023) had already filed something on his behalf. Alexander, seeking clarity as to the process, informed Reeves that "your office could not investigate any allegations against Lars if he were to leave the university. And now that he was no longer an employee of UK, I'm assuming that this holds true."

297.   Alexander closed the communication by emphasizing, "It's important to me that this is pursued, that's why I'd reached out again, but I would like to have clarity about the above please. I know these are complex issues and it would help me to have written answers so I can easily refer back and refresh my memory if needed."

298.   In a subsequent communication, Alexander expressed concern and confusion about why Jorgensen was never contacted by the Title IX Office during the 15 days before he resigned.

299.   On November 2, 2023, Interim title IX Coordinator Brandon Williams finally responded to Alexander following his request for a follow up meeting but refused to directly address UK's ability to conduct or facilitate an investigation into

the allegations of sexual assault, stating simply, "it is true, however, that not all phases of an investigation will look the same when a Respondent has left the University."

300.  To date, Alexander is uncertain as to the status of his Title IX Complaint against Lars Jorgensen.

### b)  University of Kentucky Discourages Jane Doe from Reporting.

301.  In July of 2023, Jane Doe made complaints to leadership within the swim program about Jorgensen.

302.  In August of 2023, Jane Doe left her position at the University of Kentucky.

303.  On October 11, 2023, Jane Doe emailed Title IX Coordinator Reeves.

304.  When there was no response to her email, on October 16, 2023, Jane Doe contacted Interim Coordinator Brandon Williams who aggressively discouraged Jane Doe from reporting her assault, claiming that there was nothing that could be done since Jorgensen was no longer affiliated with UK.

305.  Williams also informed Jane Doe that because Jorgensen left UK, "Title IX was unable to conduct an investigation into her allegations of sexual misconduct."

306.  Nonetheless, Jane Doe made clear that she wished for the Complaint to be filed and that her allegations of sexual assault would be investigated by UK.  She

did, however, ask that the Title IX Office answer some basic questions about procedure and process before giving her complete statement.

307.   The basic Title IX questions included things such as how long the process would take, whether they would investigate her allegations and if they were not going to investigate what the purpose of submitting a statement was under those circumstances.

308.   On November 2, 2023, the Title IX Office emailed Jane Doe, confirming that they would not investigate once an employee resigns but that giving a statement would allow UK to provide Jane Doe with "resources" such as counseling.  The email states:

> Thank you for your questions. We understand there has been some confusion about the role IEEO's Title IX Investigators have after an employee accused of violating the University's policies against sexual harassment and/or assault (AR 6:1 or AR 6:2) resigns from the University. Reviewing your allegations and taking a statement is still important because it will help us provide you with any resources you may need going forward. Such resources include counseling resources. If you are no longer at the University, we can connect you with an office at your current institution that can provide those. Our office can also assist in connecting you with any appropriate law enforcement agencies, depending on the nature of the allegations….

309.   Since Jane Doe, as she explained to Title IX, was working with a victims advocate with deep connections to excellent counseling services, she

remained confused as to whether UK intended to investigate Jorgensen if she gave a statement.

310.   Within two weeks, the Title IX Office changed its position, now suddenly suggesting that they could open an investigation, but could not do so until Jane Doe gave a full statement.

311.   The complete change in position alarmed Jane Doe and she became concerned about whether UK intended to pursue her allegations against Jorgensen or whether her statement was being taken for another reason.

312.   Jane Doe submitted to a Zoom interview wherein she provided Title IX with additional information about her abuse.   However, as soon as Jane Doe requested information about the Title IX process and whether an investigation into Jorgensen would take place, she was told that she had not given them enough information.   Jane Doe assured investigators that she would provide even more excruciating detail about her assault, but simply needed assurances about the process.

313.   At no time did UK suggest that Jane Doe could provide a written accounting of the extensive abuse that she was forced to endure.

314.   For months, UK has failed to answer Jane Doe's questions about the Title IX process, further delaying the finalization of her Complaint.

315.    In February of 2024, when the Title IX Office suggested that Jane Doe was not willing to participate in an investigation about Jorgensen, Jane Doe was flabbergasted because for all of these months, Title IX insisted that there was nothing they could do, which precipitated her query as to the Title IX process and her rights.

316.    In February of 2023, Jane Doe contacted the Title IX Office about their factually misleading email about her willingness to participate stating:

> "You sent an email on February 15th that was not accurate. I repeatedly stated that I believed these issues were serious and needed to be addressed.
> I was initially told that your office could do nothing. When your office came back later, I asked for basic simple information regarding the Title IX process, which your office continually told me could not be answered. The issue is not my willingness."

317.    To date, Jane Doe is uncertain as to the status of her Title IX Complaint against Lars Jorgensen.

## IV.    June 28, 2023: Jorgensen Resigns from His Position at the University of Kentucky and is Paid a $75,000 Settlement.

318.    On June 28, 2023, Jorgensen resigned from his position as University of Kentucky's Head Coach of the University's Swimming and Diving Program.[19]

---

[19]    Riley Overend, *Kentucky Head Swim Coach Lars Jorgensen Resigns Amid Reported Investigation*, SwimSwam (June 28, 2023), https://swimswam.com/kentucky-head-swim-coach-lars-jorgensen-resigns-amid-reported-investigation/

319.   At the time of his resignation, $402,500 remained on Jorgensen's contract through the 2024-2025 season.[20]

320.   Yet, before resigning, UK paid Jorgensen a $75,000 settlement.[21]

321.   By accepting the $75,000 settlement, Jorgensen agreed to forego the $402,500 remaining on his contract.[22]

322.   Accepting the $75,000 settlement, as opposed to the much more substantial sum remaining on his contract, suggests that Jorgensen was terminated for cause under the terms of his contract with the University of Kentucky.

323.   Under the terms of his contract, Jorgensen could be fired for cause for failure to follow university policies, acts of misconduct, or engaging in conduct that would harm a student or athlete. [23]

324.   Conduct amounting to the creation of a hostile work environment, sexual harassment, or sexual assault violates Jorgensen's contract with the University of Kentucky.[24]

---

[20]     Riley Overend, *Lars Jorgensen Received $75k Settlement Before Resignation From Kentucky*, SWIMSWAM (Aug. 24, 2023), https://swimswam.com/lars-jorgensen-paid-75k-settlement-before-resignation-from-kentuckylars-jorgensen-paid-75k-settlement-before-resignation-from-kentucky/.

[21]     *Id.*

[22]     *Id.*

[23]     *Id.*

[24]     *See Administrative Regulation 6:2 (Interim): Policy and Procedures for Addressing and Resolving Allegations of Sexual Harassment Under Title IX and Other Forms of Sexual Misconduct*, UNIVERSITY OF KENTUCKY REGULATIONS, https://regs.uky.edu/sites/default/files/2023-07/AR6.2InterimFinal08-14-20_7-31-23update.pdf (last visited Apr. 10, 2024).

**V.     The University of Kentucky Concealed Their Role in Creating a Pervasive Culture of Harassment/Assault in the University's Swimming and Diving Program.**

325.   For many years, the University of Kentucky and its agents/employees have carefully concealed their role in creating and fostering a pervasive culture of harassment and assault within its swim program under the direction of Jorgensen, so much so that it was not until just before the publication of an April 12, 2024 article in the Athletic that the University's role in perpetuating Jorgensen's illegal behavior was fully realized.

326.   When a Defendant fraudulently conceals the existence of a legal claim from the knowledge of the person entitled to sue, the statute of limitations is tolled.

327.   Here, Defendants, through the bad acts of its officers and employees, fraudulently concealed the fact that there were multiple credible complaints that Jorgensen sexually harassed and assaulted swimmers and coaching staff.

328.   The University of Kentucky had a duty to warn and a duty to protect Plaintiffs and all students/employees. Nonetheless, the University's agents, and representatives fraudulently concealed the existence of Plaintiffs' claims by concealing from Plaintiffs that the University and its employees, agents and representatives were aware of multiple complaints that Jorgensen was harassing and abusing female students/employees from 2012 to 2023 and, yet, they failed to make

a good-faith effort to stop and/or prevent it, subjecting Plaintiffs and others to years of abuse.

**VI.   November 14, 2023: SafeSport Adds Jorgensen to its Disciplinary Database for Allegations of Misconduct.**

329.   The U.S. Center for SafeSport ("SafeSport"), an American 501(c)(3) nonprofit organization created in 2017 pursuant to the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act ("Safe Sport Act"), was codified for the purpose of reducing the sexual abuse of athletes.

330.   The Safe Sport Act grants SafeSport the authority to investigate and resolve allegations of sexual abuse and misconduct.

331.   On November 14, 2023, SafeSport added Jorgensen to its Centralized Disciplinary Database identifying Jorgensen as under temporary restrictions, including "No Unsupervised Coaching / Training, Contact / Communication Limitation(s), No Contact Directive(s)" in relation to "Allegations of Misconduct."[25]

332.   SafeSport is actively investigating Jorgensen based on allegations of sexual misconduct.

---

[25]   *Centralized Disciplinary Database*, U.S. CENTER FOR SAFESPORT (last updated Arp. 12, 2024), https://uscenterforsafesport.org/response-and-resolution/centralized-disciplinary-database/.

## COUNT I
## SEX HARASSMENT IN VIOLATION OF TITLE IX:
### Creation of Sexually Hostile Culture, Heightened Risk of Sexual Harassment and Deliberate Indifference to Prior Sexual Harassment
### 20 U.S.C. §1681(a), *et seq*.
#### (Plaintiffs v. Defendant University of Kentucky)

333.   Plaintiffs restate and incorporate here all previously stated allegations.

334.   Title IX states, "No person in the United States shall on the basis of sex be … subject to discrimination under any education program or activity receiving Federal financial assistance …."

335.   Plaintiffs are "persons" covered by the Title IX statutory language.

336.   Plaintiffs participated in "activities" and/or "programs" that were part of the operations of the University of Kentucky. 20 U.S.C. § 1687.

337.   The University of Kentucky receives federal financial assistance within the meaning of 42 U.S.C. § 18116 because it receives federal financial assistance such as credits, subsidies, or contracts of insurance.

338.   Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106. 34 C.F.R. § 106.8(b) provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

339.   As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

340.   Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

341.   Title IX covers all persons subjected to discrimination in any program or activity of a school that receives any federal financial assistance and covers sexual harassment—including sexual assault and sexual abuse—by school employees, students, and third parties.

342.   Title IX requires UK to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

343.   Defendant Jorgensen was a University of Kentucky employee whose actions were carried out as a University employee and leader of one of its athletics programs.

344.   Defendant Jorgensen's harassment of Plaintiffs (and others)—which included, among other things, sexual assault, rape, subjecting them to a hostile environment, unwanted touching, fondling, and comments of a sexual nature, touching their bodies in other inappropriate ways, making inappropriate comments

about their bodies, and asking improper, sexualized questions—was sex discrimination under Title IX.

345.   Defendant Jorgensen's serial sexual harassment of Plaintiffs (and others) was rampant, occurring regularly on campus and in front of university employees over the course of ten years.

346.   The University of Kentucky had actual knowledge of Defendant Jorgensen's serial sexual harassment and failed to investigate credible allegations, permitting it to continue and even allowing him to be promoted to one of the highest levels within the Athletic Department.

347.   Throughout Defendant Jorgensen's ten-year tenure at the University of Kentucky, coaches, students and employees conveyed complaints and concerns to university administrators and employees about Defendant Jorgensen's inappropriate conduct.

348.   For a decade, Jorgensen's abuse was well known among the University's Athletics Department.

349.   Specifically, the University of Kentucky was notified about Jorgensen's sexual harassment through its employees, other swim coaches, and another university's Title IX Office, but University employees with authority to take corrective action failed to do so. These University employees include, but are not

limited to: the Athletics Director, Assistant Athletics Director and the Head of the Title IX Office.

350. The University of Kentucky's knowledge of Defendant Jorgensen's sexual abuse is indisputable.

351. In fact, on the day that Jorgensen's hire to the position of Associate Head Coach was announced, the University's Athletics Director and the Head Coach of the Swimming and Diving Program were both presented with credible allegations that Defendant Jorgensen was engaged in an inappropriate sexual relationship with a young collegiate swimmer while coaching her.

352. Instead of promptly investigating the allegations or escalating these concerns to Title IX or the EEO Office, leadership within the Athletics Department concealed the allegations at the highest level and failed to perform an investigation.

353. Likewise, in August of 2019, the Title IX Coordinator at San Jose State University forwarded an e-mail to UK's Title IX Office detailing two complaints against Jorgensen, one of whom was about Jane Doe 2's sexual assault which the University classified as "Sexual Assault, Sexual Assault-Rape." Upon information and belief, the allegations were not fully investigated, permitting Jorgensen to continue to have unfettered access to young women.

354. Likewise, when Plaintiff Alexander, Jane Doe and Jane Doe II presented UK's Title IX Office with credible allegations detailing the years of sexual

assault, abuse and harassment that they were forced to endure while a student athlete and employee of UK, Title IX rebuffed them, saying that since Jorgensen decided to resign, there could be no investigation of her claims.

355.   The University of Kentucky was required to promptly investigate and address all allegations, reports and/or complaints of unwelcome, inappropriate touching and comments by Jorgensen, but the University did not do so.

356.   Despite years of complaints, the University did not take any steps to stop Jorgensen from abusing—students and employees.  In fact, he was permitted to resign and even received a partial payment on the remainder of his contract.

357.   The University of Kentucky created and was deliberately indifferent to a sexually hostile culture within its education programs and activities, by, among other things:

   a.   Mishandling reports about Jorgensen's conduct;

   b.   Discouraging students from reporting Jorgensen's conduct;

   c.   Failing to promptly and appropriately investigate, remedy, and respond to complaints about Jorgensen's conduct;

   d.   Promoting Jorgensen and increasing his unfettered access to University students, despite credible complaints about Jorgensen's conduct from a previous employer;

   e.   Failing to adequately supervise Jorgensen, after his hire, knowing that he posed a substantial risk to the safety of student-athletes and employees;

    f.  Failing to take prompt and appropriate corrective action to prevent Jorgensen from sexually harassing other students and employees; and

    g.  Failing to train its employees to prevent, investigate, or report the sexual abuse of students and employees.

358.  The University of Kentucky's creation of and deliberate indifference to the sexually hostile culture within its swim program substantially increased the risk that Plaintiffs and others would be sexually harassed and abused.

359.  The sexual harassment and abuse that Plaintiffs suffered was so severe, pervasive and objectively offensive that it effectively barred their access to educational opportunities and benefits, including a safe educational environment and appropriate medical care.

360.  As a direct and proximate result of the University of Kentucky's creation of and deliberate indifference to a sexually hostile educational environment, which violated Title IX, Plaintiffs have suffered and continue to suffer damages and injuries.

## COUNT II
## SEX DISCRIMINATION IN VIOLATION OF
## THE KENTUCKY CIVIL RIGHTS ACT:
### Sex Discrimination, Sex Harassment, and Hostile Work Environment
### K.R.S. § 344.010 *et seq*.

### (Plaintiffs v. the University of Kentucky)

361.  Plaintiffs restate and incorporate here all previously stated allegations.

### Sex Discrimination in Place of Public Accommodation
### and Educational Institution

362.  The University of Kentucky is a place of public accommodation and an educational institution as defined in Kentucky's Civil Rights Act ("KCRA"). K.R.S. § 344.130; K.R.S. § 344.550.

363.  Plaintiffs are "person[s]" within the meaning of the KCRA. K.R.S. § 344.010(1).

364.  As students at the University of Kentucky, the University had a duty to Plaintiffs not to discriminate against them in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of sex. K.R.S. § 344.145; K.R.S. § 37.2402.

365.  The University's acts and omissions constitute sex discrimination and violate Plaintiffs' rights under KCRA by subjecting Plaintiffs to unwelcome sexual advances, assault and other conduct, both verbal and physical, of a sexual nature, all the while having actual and/or knowledge of the same.

366.   Defendants were aware, or should have been aware through reports, discussions, and accepted University culture that a sexually hostile environment existed on the campus.

367.   Despite notice of the sexually hostile environment, the University failed to take prompt and adequate remedial action to end the ongoing sexual assaults and harassment of the Plaintiffs and other female student athletes and coaches.

368.   Defendant violated KCRA and deprived Plaintiffs of their civil rights by, among other things, denying adequate protection from sexual assaults, failing to investigate and take remedial action, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational programs of the University and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

### Hostile Work Environment and Quid Pro Quo Sex Harassment

369.   The University of Kentucky is an "employer" as defined in the KCRA. K.R.S. § 344.030(2).

370.   As Volunteer Assistant Coaches, Plaintiffs were "employee[s]" of the University of Kentucky, as defined in the KCRA. K.R.S. § 344.030(5).

371.   As Assistant Coaches, Plaintiffs were "employee[s]" of the University of Kentucky, as defined in the KCRA. K.R.S. §344.030(5).

372.   Under the KCRA, the University of Kentucky had a duty to Plaintiffs not to harass them with respect to their employment, compensation, or terms, conditions, or privileges of employment because of their sex; or to limit, segregate, or classify them for employment in any way which deprived or tended to deprive them of employment opportunities, or otherwise adversely affect the status of their employment because of sex. K.R.S. § 344.040(1)(a)-(b).

373.   The University of Kentucky further had a duty under the KCRA not to subject Plaintiffs to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct or communication of a sexual nature, when such conduct or communication has a purpose or effect of substantially interfering with an individual's employment, or creating an intimidating, hostile, or offensive employment environment; or when submission to or rejection of such conduct or communication by an individual is used as a factor in decisions affecting such individual's employment

374.   The University of Kentucky further had an affirmative duty under the KCRA to prevent sexual harassment by supervisors and to take reasonable steps to eliminate harassment upon actual or constructive notice of such harassment.

375.   Notwithstanding said duties, and in willful violation thereof, the University of Kentucky subjected Plaintiffs to sexual harassment in the following ways, as articulated more specifically in the Statement of Facts of this Complaint:

a.   Subjecting Plaintiffs to harassment, innuendo, unwanted touching and sexual advances, and requests for sexual favors because of their sex;

b.   Subjecting Plaintiffs to conduct and communication, the purpose and/or effect of which was to substantially interfere with Plaintiffs' employment and/or create an intimidating, hostile and offensive employment environment for Plaintiffs because of their sex;

376.   Plaintiffs' submission to the complained of unwelcomed advances was an express or implied condition to receiving job benefits.

377.   The University of Kentucky had actual and/or constructive notice of Jorgensen's harassing behavior of female collegiate athletes and coaches at the University but failed to take prompt and adequate remedial action in response and, as a result, the harassment continued and created a sexually hostile work environment for Plaintiffs.

378.   Plaintiffs were compelled to leave their employment with the University because the sexually hostile work environment became so severe and intolerable.

379.   As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered and will continue to suffer lost wages, and other economic advantages of employment; Plaintiffs have and will continue to suffer mental anguish, humiliation, physical injury, embarrassment, and emotional distress resulting from the discriminatory conduct of Defendant.

## COUNT III
## VIOLATION OF BODILY INTEGRITY
## 42 U.S.C. §1983
### (Plaintiffs v. Defendants Jorgensen, Barnhart, and Conelly)

380.   Plaintiffs restate and incorporate here all previously stated allegations.

381.   Plaintiffs, as females, are members of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

382.   Plaintiffs also enjoy the constitutionally protected Due Process right guaranteed by the Fourteenth Amendment to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation:

> The substantive component of the Due Process Clause protects students against abusive governmental power as exercised by a school. *See Howard v. Grinage,* 82 F.3d 1343, 1349 (6th Cir.1996). To be sure, the magnitude of the liberty deprivation that sexual abuse inflicts upon the victim is an abuse of governmental power of the most fundamental sort; it is an unjustified intrusion that strips the very essence of personhood. If the "right to bodily integrity" means anything, it certainly encompasses the right not to be sexually assaulted under color of law. This conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause.
>
> *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 506–07 (6th Cir. 1996).

383.   At all relevant times Defendants were acting under color of law.

384. The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the Defendants' positions should have known.

385. At all relevant times, Defendant Jorgensen sexual assault, abuse, or molested Plaintiffs with deliberate indifference to their constitutional rights.

386. At all relevant times, Defendants Barnhart and Conelly possessed the ultimate responsibility and authority to train and supervise their employees, subordinates, agents, and/or representatives, in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

387. As a matter of custom, policy, and and/or practice, Defendants Barnhart and Conelly had and have the ultimate responsibility and authority to investigate complaints against their employees, subordinates, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

388. Defendants had a duty not to engage in sexual assault, to prevent sexual assault, abuse, and molestation, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

389.   Defendant UK's internal policies provide that "The University, in its efforts to foster an environment of respect for the dignity and worth of all members of the University community, is committed to maintaining an environment free of prohibited discrimination, which includes sexual and other forms of harassment. …….University members are expected to report violations of this policy, including sexual misconduct, to an appropriate individual."[26]

390.   Defendants Barnhart and Conelly violated the above-mentioned internal policies when they knowingly enabled Jorgensen to sexually assault Plaintiffs and others from 2012 to 2023 by, among other things:

a)  Intentionally concealing complaints of inappropriate sexual behavior against Jorgensen, dating as early as 2012;

b)  Despite having actual notice of Jorgensen's predisposition to engage in inappropriate sexual relationships, Defendants chose not to enact safeguards or other measures to protect athletes and staff, including Plaintiffs;

c)  Despite having actual notice of Jorgensen's predisposition to engage in inappropriate sexual relationships, Defendants promoted Jorgensen to the position of Head Coach of the Swimming and Diving Program, providing him with unfettered access to vulnerable female athletes and his subordinates;

d)  Despite having actual notice of Jorgensen's predisposition to engage in inappropriate sexual relationships, Defendants confined these complaints to the Athletics Department rather than escalating them to the appropriate office, such as the Title IX Office or the Office of Institutional Equity and Equal Opportunity, for further investigation or remedial action;

---

[26]    UK Sex Harassment Policy and Ethical Principles and Code of Conduct
https://regs.uky.edu/sites/default/files/2022-03/ar_6-1_final_2016-07-01_update.pdf
https://universitysenate.uky.edu/sites/default/files/University%20of%20Kentucky%20Ethical%20Principles%20and%20Code%20of%20Conduct.pdf

391.   Defendant Jorgensen violated the above-mentioned internal policies when he preyed on, sexually assaulted, and molested Plaintiffs and others from 2012 to 2023.

392.   The UK Individual Defendants' failure to address these complaints led to an unknown number of individuals being victimized, sexually assaulted, abused, and molested by Defendant Jorgensen.

393.   Defendants Barnhart and Conelly, who had or should have had knowledge Jorgensen's misconduct, were the moving forces or causes of repeated constitutional injuries to Plaintiffs and others based on their failures to report, train, supervise, investigate, or otherwise act in response to complaints of Defendant Jorgensen's conduct.

394.   Ultimately, the Defendants Barnhart and Conelly failed to adequately and properly investigate complaints of abuse including but not limited to:

**a)** Failing to perform a thorough investigation into improper conduct by Jorgensen after receiving complaints in 2012, 2013, 2014, 2015/16, 2019, 2023;

**b)** Actively concealing Jorgensen's illegal behavior;

**c)** Purposefully placing Jorgensen in a position of authority, despite knowing he sexually preyed on students and staff, further enabling Jorgensen to have unfettered sexual access to more students;

**d)** Failing to supervise, train and educate Jorgensen, Jorgensen's managers and/or students/employees so that in the absence of this supervision, training and education

Jorgensen's unlawful activities could be carried out.

395.  By failing to prevent the above-mentioned sexual assaults, abuse, and molestation upon Plaintiffs, and by failing to appropriately respond to reports of Jorgensen's sexual assault, abuse, and molestation in a manner that was so clearly unreasonable it amounted to deliberate indifference, Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983.

396.  Defendants' conduct and failures to act deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

397.  As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress.

398.  The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the Individual Defendants' positions should have known.

399.  At all relevant times, Defendants were actively involved in the unconstitutional conduct and are not being sued for vicarious liability.

## COUNT IV
## FAILURE TO TRAIN AND SUPERVISE
### 42 U.S.C. §1983
**(Plaintiffs v. University of Kentucky)**

400.  Plaintiffs restate and incorporate here all previously stated allegations.

401.   Defendant has the ultimate responsibility and authority to train and supervise its employees, agents, and/or representatives, including Defendant Jorgensen, and all faculty and staff regarding their duties toward students, faculty, staff, and visitors.

402.   Defendant failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

    **a)**    Perceive, report, and stop inappropriate sexual conduct on campus;

    **b)**    Provide diligent supervision over student-athletes and other individuals;

    **c)**    Report suspected incidents of sexual abuse or sexual assault;

    **d)**    Ensure the safety of all students, faculty, staff, and visitors to the University's campus;

    **e)**    Provide a safe environment for all students, faculty, staff, and visitors to the University's premises free from sexual harassment; and

    **f)**    Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

403.   The above list of duties is not exhaustive.

404.   Defendant failed to adequately train employees, coaches, trainers, and others regarding the aforementioned duties, which led to violations of Plaintiffs' rights.

405. Defendant's failure to provide proper training on the institution's internal policies, NCAA policies was a moving force in Defendant Jorgensen's sexual assaults of Plaintiffs.

406. Defendant's complained-of failures were deliberately indifferent.

407. UK's failure to adequately supervise or investigate Defendant Jorgensen, especially after UK knew or should have known of complaints regarding his nonconsensual sexual touching and assaults was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

408. As a result, UK and Defendant Jorgensen deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

409. As a direct and/or proximate result of Defendant's actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion and emotional distress.

**COUNT V**
**NEGLIGENCE**
**(Plaintiffs v. All Defendants)**

410. Plaintiffs restate and incorporate here all previously stated allegations.

411. Defendants owed Plaintiffs a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with

themselves and their employees, representatives, and/or agents, including Defendant Jorgensen.

412.   Defendants owed Plaintiffs a duty of due care in supervising athletic coaching, their employees, and responding to allegations of sexual assault.

413.   Defendants owed Plaintiffs a duty of care to properly supervise and train all employees, agents and representatives who oversaw students, employees and athletes in their programs and using their facilities.

414.   Defendants owed Plaintiffs a duty of care to properly supervise and train all employees, agents and representatives who supervised University employees.

415.   Defendants had a duty to investigate, discipline, and sever the employment, agency, or relationship of its employees, agents and representatives accused or suspected of committed sexual assaults or other misconduct on University students or employees.

416.   Defendants breached their duty of care when they failed to supervise and train Jorgensen and failed to ensure Plaintiffs' freedom from sexual assault as University students and employees.

417.   Defendants breached their above-mentioned duties of care by their acts and omissions that led to Jorgensen not being investigated and his sexual assaults not being addressed for nearly ten years.

418.   Defendants' breaches of their above-mentioned duties led to an unknown number of individuals—including Plaintiffs—being victimized, sexually assaulted, abused, and molested by Defendant Jorgensen.

419.   As both a direct and proximate result of Defendants above-mentioned acts and omissions in breach of their duties, Plaintiffs suffered and continue to suffer many physical and emotional pains and injuries.

## COUNT VI

## VICARIOUS LIABILITY FOR BATTERY PURSUANT TO SECTIONS 219 OF THE RESTATEMENT (2ND) OF AGENCY

### (Plaintiffs v. University of Kentucky)

420.   Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

421.   At all relevant times herein, Jorgensen was an employee of UK.

422.   The Restatement (Second) of Agency, Section 219(2) states:

A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

   a. The master intended the conduct or the consequences, or
   b. The master was negligent or reckless, or
   c. The conduct violated a non-delegable duty of the master, or
   d. The servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation

423.   UK Defendants conduct described above in hiring, retaining and supervising Jorgensen was negligent and reckless.

424.   Jorgensen purported to act and speak on behalf of UK and Plaintiffs relied upon Jorgensen's authority as a coach and supervisor.

425.   Jorgensen was aided in accomplishing sexual abuse by UK Defendants because UK failed to disclose to Jorgensen's team and staff that he was a serial sexual predator.

426.   At all times relevant herein, pursuant to UK's internal policies prohibiting discrimination and harassment, UK undertook to provide students and employees with a safe setting, free of abuse, such as emotional, mental, physical, sexual abuse, verbal abuse, neglect, exploitation, intimidation, harassment, or any other form of discrimination.

427.   UK also owed Plaintiffs other legal duties, including:

   a.  to act only in their best interest, and to refrain from conduct likely to harm them;

   b.  to aid or protect them because it invited them onto its premises to work and to obtain an education;

   c.  to supervise Jorgensen so as to prevent him from harming them;

428.   These duties were non-delegable duties of care.

429.   Defendants' conduct described above violated the nondelegable duties of care owed by UK to its students/employees, including Plaintiffs.

430.   Pursuant to Section 219 of the Restatement (Second) of Agency, UK is vicariously liable for Jorgensen's conduct as it applies to Plaintiffs.

431.   As a direct and proximate result of one or more of the foregoing negligent acts or omissions of Jorgensen, Plaintiffs have suffered, and will continue to suffer, serious physical and mental injury, emotional distress, embarrassment, a loss of economic well-being, and other permanent injuries.

## COUNT VII
## VICARIOUS LIABILITY FOR BATTERY PURSUANT TO SECTION 317 OF THE RESTATEMENT (SECOND) OF TORTS
### (Plaintiffs v. University of Kentucky)

432.   Plaintiffs repeats and realleges the preceding paragraphs as though fully set forth herein.

433.   All times relevant herein, Jorgensen was an actual employee of UK.

434.   The Restatement (Second) of Torts, Section 317 states:

> A master is under a duty to exercise reasonable care so as to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them if
>
> a.  the servant
>
>     i.   Is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>     ii.  Is using a chattel of the master, and
>
> b.  the master
>
>     i.   knows or has reason to know that he has the ability to control his servant, and
>     ii.  knows or should know of the necessity and opportunity for exercising such control.

435.   Jorgensen's conduct against Plaintiffs was committed on UK's premises.

436.   Prior to Jorgensen's sexual abuse of Plaintiffs, UK knew or had reason to know that it had the ability to control Jorgensen.

437.   Prior to Jorgensen's sexual abuse of Plaintiff, UK knew or should have known Jorgensen was a serial sexual predator and therefore knew of the necessity and had the opportunity to control Jorgensen's access to patients.

438.   Pursuant to Section 317 of the Restatement (Second) of Torts, UK is vicariously liable for Jorgensen's conduct as it pertains to Plaintiffs.

439.   As a direct and proximate result of one or more of the foregoing negligent acts or omissions of UK, Plaintiffs have suffered, and will continue to suffer, serious physical and mental injury, emotional distress, embarrassment, a loss of economic well-being, and other permanent injuries.

## COUNT VIII
### BATTERY
**(Plaintiffs v. Defendant Jorgensen)**

440.   Plaintiffs restate and incorporate here all previously stated allegations.

441.   Jorgensen knowingly, and without consent and in violation of his duty to refrain from such conduct, physically and sexually abused Plaintiffs.

442.   Jorgensen knowingly, and without consent, committed a willful touching of Plaintiffs that constituted physical and sexual abuse.

443.   As a direct and proximate result of Jorgensen's actions, Plaintiffs have suffered and will suffer serious physical and mental injury, emotional distress, embarrassment, loss of economic well-being, and other permanent injuries.

444.   As both a direct and proximate result of Defendants above-mentioned acts and omissions in breach of their duties, Plaintiffs suffered and continue to suffer many physical and emotional pains and injuries.

**COUNT IX**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(All Plaintiffs v. Defendant Jorgensen)**

445.   Plaintiffs restate and incorporate here all previously stated allegations.

446.   At all times relevant, Defendant Jorgensen's actions and statements towards Plaintiffs were extreme and outrageous, and violated his professional, ethical, and legal duties to refrain from such conduct.

447.   At all times relevant, Jorgensen stood in a position of authority over Plaintiffs such that the extreme and outrageous nature of the conduct was amplified.

448.   At all times relevant, Jorgensen's conduct was reckless, intentional, or with conscious disregard of the probability of causing emotional distress.

449.   As both a direct and proximate result of Defendants above-mentioned acts and omissions in breach of their duties, Plaintiffs suffered and continue to suffer many physical and emotional pains and injuries.

450.   As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this complaint, Plaintiffs have experienced serious and in some cases life threatening and irreversible psychological damage; Plaintiffs have and will incur substantial economic losses in the nature of medical expenses, lost wages; Plaintiffs are entitled to an award of non-economic damages in the nature of pain and suffering, embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request this Court and the finder of fact to enter a Judgment in Plaintiffs' favor against Defendants on all counts and claims above in an amount consistent with the proofs of trial, and seeks an award against Defendants for all appropriate damages arising out of law, equity, and fact for each or all of the above counts where applicable, including but not limited to:

a.   Compensatory damages in an amount to be determined as fair and just under the circumstances, by the trier of fact including, but not limited to medical expenses, loss of earnings, mental anguish, anxiety, humiliation, and embarrassment, violation of Plaintiffs' Constitutional, Federal, and State rights;

b.   Reinstatement to a comparable position;

c.   Damages for deprivation of equal access to the educational opportunities and benefits provided by the University of Kentucky;

d.    Punitive and/or exemplary damages in an amount to be determined as reasonable or just the trier of fact;

e.    Reasonable attorney fees, interest, and costs; and,

f.    Other declaratory, equitable, and/or injunctive relief, including, but not limited to implementation of institutional reform and measures of accountability to ensure the safety and protection of young athletes and other individuals, as appears to be reasonable and just.

**Dated: April 12, 2024.**

Respectfully submitted,

By: ***/s/ Justin Whittaker***
Justin Whittaker, Esq. (92364)
WHITTAKER LAW, LLC
2055 Reading Road, Suite 260
Cincinnati, Ohio 45202
(513) 259-3758
(513) 436-0689 (fax)
Justin@WhittakerLawFirm.com

Megan A. Bonanni, Esq.
Channing Robinson-Holmes, Esq.
PITT, McGEHEE, PALMER
BONANNI & RIVERS. P.C.[27]
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
(248) 398-9804 (fax)
mbonanni@pittlawpc.com
crobinson@pittlawpc.com

**Counsel for Plaintiffs**
**Briggs Alexander, and Jane Doe**

---

[27]    Megan A. Bonanni, Esq. (Michigan Bar #P52079), *pending admission pro hac vice.*

Channing Robinson-Holmes, Esq. (Michigan Bar #P81698), *pending admission pro hac vice*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury of all of the facts and issues involved in this matter and has paid the appropriate jury fee for same.

**Dated: April 12, 2024.**

Respectfully submitted,

By: _**/s/ Justin Whittaker**_
Justin Whittaker, Esq. (92364)
Whittaker Law, LLC
2055 Reading Road, Suite 260
Cincinnati, Ohio 45202
(513) 259-3758
Fax: (513) 436-0689
Justin@WhittakerLawFirm.com


Megan A. Bonanni (MI #52079)
Channing Robinson-Holmes (MI #81698)
PITT, McGEHEE, PALMER
BONANNI & RIVERS. P.C.
Attorneys for Plaintiffs
117 W. Fourth Street, Suite 200
Royal Oak, MI  48067
248-398-9800
248-398-9804 (fax)
mbonanni@pittlawpc.com
crobinson@pittlawpc.com

**Counsel for Plaintiffs**
**Briggs Alexander and Jane Doe**